J. C. HELWIG, Administrator of the Estate of Elias Fogelsong, Appellant, v. THOMAS FOGELSONG et al., BELLE WORKMAN, Appellees.

**Principal and agent:** EXISTENCE OF RELATION. Where one having a claim against an estate left it for collection with the agent of the heirs of the estate, who had the real property for sale, such agent became the agent of the claimant, so far as the collection of the claim was concerned, rather than the agent of the purchaser of the property; and the fact that he advanced the price of the real estate to the purchaser did not make him the purchaser's agent.

**Estates of decedents:** CLAIMS: ESTOPPEL. Where one having a claim against an estate knowingly and in silence permitted a purchaser to buy the real property of the estate from the heirs, in the belief that he was acquiring the title free from debts of the estate, and the claimant made no effort to enforce the collection of his claim further than to leave it with the agent of the heirs who had charge of the sale of the property, who failed to collect the same, he was thereafter estopped to assert the claim as a lien against the property so sold.

**Estoppel:** FRAUD. A fraudulent intent is not essential to an estoppel; it is enough if a fraudulent result would follow, even from the silence of a party whose duty it was to speak, and who, having an opportunity to speak and knowing the circumstances failed to do so.

**Same.** Where one holding a claim against property makes no attempt to assert it a presumption of reliance on his failure to act arises in favor of a purchaser who paid full value for the property.

**Husband and wife:** AGENCY: ESTOPPEL. In this action the evidence is held to show that a husband was the agent of his wife in attempting to enforce a claim of the wife against lands of the estate purchased from the heirs, and that she was estopped from claiming a lien upon the lands.

*Appeal from Van Buren District Court.*—HON. C. W. VER-
MILLION, Judge.

TUESDAY, OCTOBER 6, 1914.

THIS is an action brought originally in probate, being an application for the sale of real estate to pay indebtedness. It was transferred to the chancery docket and tried as an equitable action. All the defendants except Belle Workman were in default. The issues were those raised by the answer and amendment of defendant Belle Workman, and were: Whether or not the property in question was a homestead of decedent at the time of his death; and, second, whether or not the appellants were estopped from having said property sold for the payment of the debts of decedent.

The first issue was decided in favor of the plaintiff, holding that the property in question was not a homestead because the homestead right had been abandoned by deceased. The court held that the property was liable for the payment of the debts of deceased, and ordered a sale of the property for the payment of a part of the indebtedness of the estate. From this order and decision no appeal has been taken by any of the defendants. But the court also held that B. J. Hall and May Hall, his wife, two of the persons having claims allowed against said estate, were estopped from having the same paid out of this property or the proceeds of sale. From this holding and refusal and orders the plaintiff has appealed, and the claimants, B. J. Hall and May Hall, for the purpose of the appeal appear and join in the appeal.—*Affirmed.*

*J. E. Hall* and *Walker & McBeth,* for appellant.

*J. C. Calhoun,* for appellee Workman.

PRESTON, J.—Elias Fogelsong, who was a widower at the time of his death, died intestate July 8, 1911. At the time of his death, and for several years prior thereto, he had made his

home with B. J. Hall and wife. B. J. Hall was a nephew of deceased. The children of deceased were all of age, and had moved away some years before. Prior to the death of Mr. Fogelsong, there were some negotiations for the sale of the real estate in question to defendant Belle Workman for $800, one E. O. Syphers, a real estate agent, acting as the agent for Mr. Fogelsong. But the transaction was not completed. After the death of deceased, one of the daughters, a Mrs. Miller, came back to the funeral, and after the funeral she and Syphers revived the negotiations with Mrs. Workman for the sale of the property, and a contract was prepared and executed. The contract price was to be $800, and Mrs. Workman put up a forfeit of $100, which was later applied on the purchase money. A warranty deed was prepared and sent around for the different heirs to sign. All of these transactions were soon after the death of Elias Fogelsong. The deed bears date July 20, 1911, and was filed for record September 7, 1911. It was signed by all the heirs. Syphers was acting as agent for the heirs in the sale of the property after the death of Elias. The deed was prepared by Syphers and sent off and was to have been returned to him, but on September 6, 1911, one of the heirs, Thomas Fogelsong, brought the deed with him from Oklahoma. The arrangement was that the money was to be paid to Syphers, but the $100 put up as a forfeit was paid on the purchase price, and the balance, $700, was first paid by Syphers to Thomas Fogelsong, and the defendant Belle Workman afterwards paid to Syphers the $700 so advanced. When Thomas Fogelsong appeared with the deed, he proposed to Syphers that he would deliver the deed upon receipt of the payment, and at that time promised Syphers that he would pay all claims against the estate, including the claim of B. J. Hall. The money was so paid to Thomas, as before stated, and the deed delivered to the purchaser, Belle Workman. Thomas proved to be dishonest, and did not pay any of the claims, but left with the money.

It seems to have been the plan to settle the estate without

the expense of an administrator. Appellant B. J. Hall knew of the negotiations for the sale of the property, both before and after the death of Elias Fogelsong; knew that Mrs. Workman was about to buy the property; and, according to the testimony of Syphers, although it is denied by Hall, suggested and urged that Mrs. Workman be required to sign a written contract. As stated, all this transpired within a few days after July 8, 1911. Hall left his claim with Syphers to collect, as he expresses it, out of the proceeds of the sale of the real estate. Soon after the money was paid, he called on Syphers for his pay and found that Syphers had nothing for him. Then Hall sent for his brother, who is a lawyer, and these proceedings were begun. May Hall had no thought of filing a claim until after they had failed to get their money from Syphers. Mr. Hall testifies that he has an interest in his wife's claim, and that no claim on her part would have been made had his claim been paid as per agreement. It was represented to Mrs. Workman that the property was entirely free from all liens and incumbrances, and that the title was good, and that she should have a warranty deed. It clearly appears from the testimony that Hall knew of the negotiations for the sale of the property, that he expected it to be sold, and that he expected to get his pay for his claim out of the proceeds of the sale. He did not inform the purchaser, Mrs. Workman, that he had, or that he would claim, a lien. It seems to have been the understanding of all parties that the property was to be sold, and there was no objection to its sale, and that the claim of Hall was to be paid out of the proceeds. The purchaser, Belle Workman, paid the full price or value for the property. As to this, there is no dispute.

To a proper understanding of some of the questions raised, we will set out the substance of the two claims filed by appellant B. J. Hall and his wife. These claims were both filed October 7, 1911. The claim of B. J. Hall is for nursing, rooming, boarding, and caring for the above-named deceased from May 10, 1905, to July 8, 1911, $300, and Mrs. Hall's

claim is for nursing, cooking for, working for, cleaning room, making bed, and waiting on deceased from May 10, 1905, to July 8, 1911, $200. Mr. Hall had consented to the method of settling the estate and the payment of his claim as heretofore indicated, and, as before stated, left his claim ,with Syphers to collect.

The trial court found by its decree, among other things, that the defendants the heirs of Elias Fogelsong, by their agent, Syphers, represented to the defendant Belle Workman that the property in question was the homestead of decedent at the time of his death, and not liable for the payment of any indebtedness against his estate; that she relied on such representations and purchased the property from the said heirs through their said agent and paid the full amount of the purchase money; that the property was not a homestead; that the claims filed are those of B. J. Hall and his wife, and two other claims amounting to $195; that there is no personal property out of which said claims can be paid; that B. J. Hall was the agent and representative of his wife in the matter, and that said B. J. Hall nor May Hall, at the time of the sale to Belle Workman, intended to file any other or further claim against said estate than the claim of said B. J. Hall as left with said Syphers, and that no other or further claim on behalf of said B. J. Hall or May Hall would have been filed had said claim so left with Syphers been paid; that the claimants, B. J. Hall and May Hall, are estopped from now making any claim against said property, and are estopped from having said property sold for the payment of either of their claims, and estopped from having payment of either of their said claims made out of the said property or the proceeds of the sale thereof (by the administrator). The administrator was authorized and empowered to sell the real estate for the payment of the two claims other than those of the Halls, and other claims which might be established against the estate, if any.

There is no serious conflict in the evidence as to the main

facts. It will be well, perhaps, to refer a little more particularly to the evidence of Mr. Hall in regard to the facts relied upon as an estoppel. He testifies:

Mrs. Miller was the only one of the children of deceased that came back to the funeral. After we buried him she asked me if I would go around and find out the claims that were against him, and I took her wherever I thought there was any claims against him, and after we got through she went up to my house for dinner. I knew a deed had been prepared and sent to the heirs to sign. She [Mrs. Workman] had not paid anything on it to my knowledge. I don't know when the deed got back. That afternoon when Mrs. Miller said we would go down to Syphers' office, and I gave Syphers my claim, she said he would fix the business. I expected Syphers to collect the claim because he said he had sold the property to Mrs. Workman, and I expected the money would be paid to him and he would collect it. I was away after that, and when I came back I learned that Tom Fogelsong had been there and collected the money and gone, and I supposed my claim had been paid, and I went up to see Syphers and asked him if he had collected it, and he said, 'No.' I said: 'Why didn't you? I gave you the claim to collect.' He said he told Tom Fogelsong he had some claims there to collect, and Tom said: 'Yes, I know it. I am going to pay them.' Syphers said all the claim he kicked on was the doctor's bill, and said 'I will be here to-morrow. You tell the boys I am going to settle with all of them.' I guess he got a rig and drove to Pulaski. I never saw him. As soon as I learned that my claim had not been paid I sent for my brother and he came down and filed this application. The property was left in Mr. Syphers' hands to sell, and I asked him if he wouldn't collect my bill, and he said he would. I knew he was going to sell the property. I supposed it was to Mrs. Workman. I never said anything to her about having a lien on the property. I expected to get my money from Mr. Syphers. If they had paid my claim of $300 there would not have been any claim filed by my wife.

There is a conflict in the evidence as to whether Mr. Hall suggested to Syphers that he get a contract from Mrs. Workman for the sale to her of the property. As to this, he says:

It was soon after Fogelsong's death that Syphers said they could sell the property to Mrs. Workman. He did not tell me that she had signed a contract. I don't know anything about the contract. I did not suggest to Syphers to get a contract from Mrs. Workman. I don't remember of being in the office when Minnie (Miller) suggested it.

But Syphers testifies in regard to this:

I did not have a written contract with Mrs. Workman until after Mr. Fogelsong died. I then got the instrument up and signed by Mrs. Workman, and I think by Mrs. Miller. This contract was made at the suggestion of Minnie and B. J. Hall, if I remember right. The contract was taken directly after Mr. Fogelsong died. At the time Minnie Miller and Mr. Hall came into my office directly after the old man's death we talked the matter over, and Mr. Hall, I think, was present, and Mrs. Workman was there and wanted to buy the property for the price of $800, and Mr. Hall was present. . . . If I remember right, Ben Hall came here with Minnie Miller and urged that I get up a contract and some money. It runs in my head that Minnie urged it. I got up a contract.

It is not very material whether Mr. Hall suggested or urged that a contract be made with Mrs. Workman. He did know the property was about to be sold to her; that she was to pay full price for it; he made no objection thereto, and did not inform her that he had a lien or claim against the property, or that he would claim a lien; he was willing that it should be sold, and expected to get his pay out of the proceeds of such sale. The man Hall relied upon to collect the claim, Syphers, failed to carry out the arrangement, either through neglect or because he was misled by the promise of Thomas Fogelsong to pay the claim. Though Syphers had been acting as agent for the Fogelsong heirs in selling the property, and for Mrs. Workman in some other matters, and perhaps, to some extent, for her in this matter, yet as to the collection of the Hall claim out of the proceeds of the sale of the property to Mrs. Workman, we think he was the agent for Hall. Mrs. Workman had

1. PRINCIPAL AND AGENT: existence of relations.

nothing to do with employing Syphers to sell the property; she did not leave the claim with Syphers for collection; she had nothing to do with the settlement of the estate and payment of claims in the manner attempted. That was a matter between the Fogelsong heirs and Hall so far as his claim is concerned. As bearing on this point as to whether Syphers was the agent of Hall in the collection of the money, see *Walton v. Dore,* 113 Iowa, 1; *Thomas v. Desney,* 57 Iowa, 58; *Goodale v. Middaugh,* 8 Colo. App. 223 (46 Pac. 11).

The fact that an agent employed to sell land advances the price to the purchaser does not make him the purchaser's agent. *Goodson v. Embleton,* 106 Mo. App. 77 (80 S. W. 22); *Lawson v. Thompson,* 10 Utah, 462 (37 Pac. 732).

Under the circumstances shown in this case, it is clear that it would be inequitable to now permit Hall to claim a lien and require that the property be again sold by the adminis-

2. ESTATES OF DECEDENTS: claims : estoppel.

trator and compel Mrs. Workman to lose the property and the $800 she paid for it, or pay this claim. Hall knowingly permitted Mrs. Workman to purchase the property under an erroneous opinion of title, without making known his claim on the property; he has taken one position and attempted to change it, to the detriment of Mrs. Workman; he stood by and remained silent when good conscience required him to speak. He cannot, by his silence, induce or encourage the doing of an act and then be heard to complain of it. If he intended to claim a lien, good faith and fair dealing required that he should make the fact known to Mrs. Workman before she paid the money. If he thought of it at all, he may, in his own mind, have concluded that he would claim his lien if he did not get the money through Syphers, but she would not be bound by such unexpressed purpose in his own mind. We are of opinion that under well-established rules, he is estopped from now asserting his lien on the property and from seeking to enforce it. If it be conceded that both Mrs. Workman and Hall were innocent parties, one of whom must suffer for the wrongful

act of another, Hall is the one who rendered the act possible, and he must bear the burden.

As to the question of estoppel, many cases are cited in the briefs, but a citation of a few will be sufficient. The case is not like *Near v. Green*, 113 Iowa, 647, where one making a statement did not know that another person had any interest in the property, or that she intended or was likely to act upon what he said, and where it was held that under such circumstances there was no estoppel.

Nor is it like *Kirchman v. Standard Coal Co.*, 112 Iowa, 668, where it was held that it is well understood that one who knows, or has reasonable ground to believe, that another is about to act in reliance upon his statement with reference to his rights, or on his omission to assert his rights, is estopped from setting up any claim inconsistent with that which the latter has thus been led to believe was the truth. But it was there said that the cases do not go so far as to hold that a mere random statement, made without any fraudulent intent, to one who, so far as the speaker has any reason to know, is without present or prospective interest in the matter referred to, will estop the speaker from afterwards asserting any rights which he may have had, even though inconsistent with the statement. Such was the situation in that case.

Where a party knowingly, though it be done passively by looking on, suffers another to purchase land under an erroneous opinion of title, without making known his own claim, he will not afterwards be permitted to exercise his legal rights against such person. *McPherson v. Berry*, 92 Iowa, 64; *Morgan v. Railway*, 96 U. S. 716 (24 L. Ed. 743); *Kirk v. Hamilton*, 102 U. S. 68 (26 L. Ed. 79).

A party who has taken one position by which he expects to be benefited is estopped from repudiating that and taking another inconsistent position to the prejudice of another. *Daniels v. Tearney*, 102 U. S. 415 (26 L. Ed. 187).

Plaintiff's homestead was sold upon the foreclosure of a mortgage, without legal notice to him of the suit. The mort-

gagee bought the property at sheriff's sale and, in due time, received a deed therefor.  Plaintiff stood by and saw defendant make improvements upon the property without asserting his rights by reason of the want of notice, and the court said that plaintiff was literally standing by and witnessing the construction of the buildings and improvements upon the lots which he now claims, without a word of protest or objection thereto.  The law will estop him to set up a claim to the property and seal his lips so that he can utter no complaint. He should have proclaimed his interest and claim so that defendants would have been warned of the danger threatened to their claim of title.  *Schlawig v. Fleckenstein,* 80 Iowa, 668, 671; *Lucas v. Hart,* 5 Iowa, 415, 419.

One who stands by and encourages a stranger to purchase property offered for sale under foreclosure of a chattel mortgage cannot afterwards be heard to claim as against such stranger that he had at the time of such sale a paramount claim on the property purchased.  *Miles v. Lefi,* 60 Iowa, 168.  See, also, *Livingston v. Stevens,* 122 Iowa, 62.

Where a landlord having a lien for the rent of farm lands upon crops grown upon the premises permitted the crops to be harvested and carried to market and there sold to a purchaser, without notice of his lien, in reliance upon the tenant paying him the rent out of the proceeds, held that the landlord was estopped from asserting any claim to the crop sold as against such purchaser.  *Wright v. Dickey Co.,* 83 Iowa, 464.

One who by his conduct has permitted another to act, to the latter's disadvantage, will not afterwards be permitted to change his position.  *Wright v. Lieth,* 146 Iowa, 290.

A fraudulent intention is not essential to the doctrine of estoppel.  It is enough if a fraudulent effect would follow allowing a party to set up a claim inconsistent with his former declarations or conduct.  Estoppel may arise from silence, as well as words, where there is a duty to speak, and the party on whom the

3. ESTOPPEL: fraud.

duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent. *Thompson v. Simpson,* 128 N. Y. 270 (28 N. E. 627).

II. It is said by appellant that it does not appear from the evidence that Mrs. Workman relied upon the representations of Syphers and the Fogelsong heirs and the silence of Hall as to his claim, and that therefore there can be no estoppel. She did not so testify in so many words. But she was to have, and did get, a warranty deed. It was stated to her that she was to get good title, free from all liens. Syphers represented to her that the property was the homestead of deceased, and not liable for debts. He may have thought so because the property had at one time been the homestead of Elias Fogelsong. Hall would not, of course, be responsible for such representations, but he knew she was buying the property and paying full value for it. She was a widow with small children and limited means. She was buying this small home for $800. It is unreasonable to suppose for a moment that she would pay $800, the full value of the property, if she had supposed that she might be compelled to pay, in addition, the claims of Mr. Hall and wife in the sum of $500 or of Mr. Hall's $300, if she had known they would attempt to rely upon or enforce the claims against the property. It is a matter of common sense and common knowledge that she, or a person so situated, would, and that she did, rely on Hall's silence. Possibly she was bound to know the law that if the property was not a homestead, it would be liable for debts. If she had employed an attorney, or obtained an abstract, she would doubtless have been advised further about it. But she says she did not obtain an abstract or consult an attorney as to title. This is a circumstance tending to show that she believed she was getting the property free from liens. The failure of Hall to inform her that he had a lien, if he intended to rely upon it, and his failure to speak when he should have spoken, tended directly to mislead her, to her prejudice. It

4. SAME.

will be presumed that Hall intended to be understood according to the reasonable import of his conduct. *Sessions v. Rice,* 70 Iowa, 306; *Wallerich v. Smith,* 97 Iowa, 308, 311.

In *Williams v. Wells,* 62 Iowa, 740, 749, it was said that the law will presume that defendant would not have accepted a title incumbered with a possible dower interest.

We think it should be held that Mrs. Workman relied upon the failure of Mr. Hall to assert his claim.

III. Appellant contends that the court erred in its finding that Mr. Hall was the agent for his wife, and claims that there is no estoppel shown as to her and her claim of $200.

5. HUSBAND AND WIFE: agency: estoppel.
It is true that neither she nor her husband left her claim with Syphers. The evidence is not clear in regard to this matter of Mrs. Hall's claim. But it is not shown that she did anything about her claim. So far as the record shows, all that was done about it was done by Mr. Hall, and, so far as anyone has assumed to speak for her, it has been her husband. She was not a witness in the case. The fact that the two claims were for similar services for deceased and covering the same period of time has been before referred to. Mr. Hall says he had an interest in his wife's claim. This is on the theory, we take it, that he considered that his wife's services belonged to him. He says her claim would not have been presented at all if his claim had been paid according to the agreement. In this last, he assumes to speak for her, and without denial or objection on her part. There is no evidence that Mrs. Hall had a separate occupation. True, that was not an issue, and the validity of her claim was not in issue in the trial of this case. Her claim had been allowed by the administrator. But it has a bearing on the question as to whether Mr. Hall was acting for his wife, since he says he had an interest in her claim, and that her claim would not have been filed if his had been paid. As we understand the record, Mr. Hall employed his brother as an attorney to look after her claim, as well as his own. The filing of both claims and the com-

mencement of these proceedings to sell the real estate to pay the claims are a part of the same transaction. As bearing on this, it will be remembered that the purchase money for the property was paid to Thomas Fogelsong September 6, 1911; the deed was filed for record the next day. Mr. Hall testifies that:

As soon as I learned that my claim had not been paid, I sent for my brother [a lawyer] and he came down and filed this application.

This refers to the present case, which was, in the first place, an application by the administrator to sell the property to pay debts. The dates to be mentioned are material. The petition for the appointment of an administrator was verified October 4, 1911, and filed October 7, 1911. The claims of Mr. and Mrs. Hall were both filed on the same date, October 7, 1911; the petition by the administrator to sell the property was verified October 9, and filed October 10, 1911. We do not find that the date of the allowance of these claims is shown in the record.

There is not a word of evidence in the record that Mrs. Hall ever did anything in regard to her claim or its enforcement by the sale of the property. In so far as there is any showing in this matter, it was all done by Mr. Hall as to both claims. Another circumstance bearing on this matter is the fact, before referred to, that Mrs. Miller asked Mr. Hall about the claims against her father's estate, and he took her to all those he thought would have claims, and that Mrs. Miller went to his home for dinner. He testified, further, that, "There was nothing said about my wife's claim at that time." It does not appear that Mrs. Hall was at home at this time, nor does it appear that she was absent. She had been keeping house for her husband recently before, for her claim against the estate of deceased shows she had been doing work such as cooking and the like. Unless Mr. Hall expected Mrs. Miller, his guest, to get the dinner, or unless he expected to get it for

her, it is fair to assume that Mrs. Hall was present at this time when Mr. Hall was taking Mrs. Miller around wherever he thought there were any claims against the deceased, and, from this and other circumstances, it is a fair inference that Mrs. Hall did not intend to make any claim or insist upon a lien, or that she would leave the management of it to her husband, who had an interest in her claim. The claims of both Mr. and Mrs. Hall have reference to their services in caring for deceased in their home, matters of a domestic nature, and the supposed agency of the husband for her is in reference thereto, and whether he or she shall be paid therefor. Under such circumstances, it has been held that slight evidence of actual authority is sufficient. *Furman v. Railway,* 62 Iowa, 395, 398.

There may be other circumstances bearing on this matter, but we think those given sufficient. The court did not err in holding that Mr. Hall was agent for his wife, and that she, as well as he, is estopped from now claiming a lien on the property in question. We are of opinion that the decree of the district court was right, and it is therefore—*Affirmed.*

LADD, C. J., and EVANS and WEAVER, JJ., concur.