VIOLA S. RICE et al., Appellants, v. MODERN WOODMEN OF AMERICA et al., Appellees.

**INSURANCE:** Life Insurance—Disqualification of Beneficiary—Estoppel. A beneficiary under a life policy may estop himself from claiming that his joint beneficiary is disqualified by the by-laws

of the insurer and by the laws of the state from being such bene-
ficiary.

*Appeal from Jones District Court.*—F. L. ANDERSON, Judge.

JANUARY 8, 1924.

ACTION upon a beneficiary's certificate issued to C. M.
Brown by the Modern Woodmen of America, a fraternal benefi-
ciary society. The society paid the money into court, and was
released from liability, and withdrew from further participa-
tion in the case. Ethel Farley, appellee, answered the petition
of plaintiffs, who claimed the full proceeds of the certificate as
surviving beneficiaries, on the ground that Ethel Farley is dis-
qualified as a beneficiary, and also filed a petition in interven-
tion. The court found in favor of Ethel Farley, and plaintiffs
appeal.—*Affirmed.*

*E. E. Reed,* for appellants.

*Remley & Remley,* for appellee.

STEVENS, J.—C. M. Brown died at Monticello, Iowa, on or
about September 12, 1921, survived by five children, the appel-
lants herein. He was twice married,—the second time to one
Caroline Oest, whom he survived. No children were born to the
second marriage. Caroline Oest had also previously been mar-
ried to one Victor Chambers, from whom she was divorced in
1886. Appellee Ethel Farley was born in 1884, and claims to
be the daughter of Caroline Oest and Victor Chambers.

At the time of his death, Brown held a benefit certificate
for $2,000 in the Modern Woodmen of America, bearing date
July 20, 1921, in which appellants and Ethel Farley are named
as beneficiaries. They are designated therein as "sons and
daughters." This certificate was issued after the death of Caro-
line Brown, to take the place of a former certificate, in which
she was named as beneficiary. After the commencement of this
action, the benefit society paid the fund into court, and was dis-
charged from all liability, and took no further part in the litiga-
tion. Trial was had upon the issues joined between the appel-

lants, to whom the certificate gave $200 each, and Ethel Farley, who was given the remaining $1,000.

. Much of counsel's argument is devoted to a discussion of the alleged ineligibility of appellee Ethel Farley to be named as a beneficiary in the certificate. It is earnestly contended that she did not sustain such relationship to C. M. Brown as, under the rules of the society and the statutes of this state, entitled her to be named a beneficiary or to share in the proceeds of the certificate.

This contention of counsel's involves several interesting and perplexing legal propositions, a decision of which is quite unnecessary to a proper disposition of the case in this court. The right of appellants, if such right, under the facts of this case, existed, to claim the $1,000 in controversy, under the by-laws of the society, as surviving beneficiaries, is one which they could waive. The moment the money was paid to the clerk of the district court by the society, and it was released from liability and withdrew from the case, said money became a fund in court, and the controversy was reduced to the issues between the rival claimants thereto. One of the issues tendered by appellee Ethel Farley was an equitable estoppel. This plea, as set up in the answer, goes directly to the right of appellants to dispute her right to share as a beneficiary in the fund. Her right to set up a plea of estoppel, based upon inequitable conduct on the part of appellants, is in no sense limited by consideration of the original source of the funds. This becomes quite immaterial. In view of our conclusion upon this issue, we shall omit discussion of the other propositions relied upon by appellants for reversal.

Going a little further into detail: The record shows that C. M. Brown was divorced from his first wife, the mother of appellants, about 1901, and shortly thereafter married Caroline Oest, the divorced wife of Victor Chambers. The divorce decree gave the custody of appellants to their mother, with whom they thereafter resided until they were married, or established homes for themselves. The estrangement between Brown and their mother seems to have extended to appellants, as they had little or nothing to do with him thereafter, until very shortly prior to his death. Ethel Farley resided with the Browns for several years, and until she was married. The relationship be-

tween them was always close and affectionate. The deceased also apparently retained much of his affection for his own children. This is evidenced by the terms of the benefit certificate. Brown·and his wife resided in Dubuque for several months immediately preceding January, 1921. Sometime during that month, they returned to Monticello, where they had formerly resided, and took up their residence with appellee Ethel, who was engaged in conducting a rooming or boarding house. Mrs. Brown died early in the summer of the same year. Whether Brown was in ill health at that time does not appear; but the evidence does show that he soon became an object of considerable care to his stepdaughter, and died, as stated, the following September. After the death of his wife, he continued to reside with Ethel Farley. He appears to have had no money or property. During this period, he was visited by some, or all, of appellants, who joined, to some extent at least, in providing care and nursing for him. Perhaps in June or July, he discussed the subject of his insurance with some one or more of appellants. It does not appear that they at any time attempted to influence or induce him to make them the sole beneficiaries thereof. They learned that the original certificate named Mrs. Brown as the beneficiary, and that he contemplated changing it so as to name appellants and appellee as beneficiaries. After the death of Mrs. Brown, the appellants Viola Rice and George Brown, on behalf of themselves and the remaining appellants, made an oral agreement with Ethel to pay her $10 per week for the board and care of their father, *unless* the policy was changed in her favor. Four payments of $10 each were made, in pursuance of this arrangement. Charles Brown, another of appellants, testified that he was present, and heard a conversation between Ethel and his father about a change of beneficiary; that she asked him if he desired "Granny's" insurance (meaning Mrs. Brown) made to her, and he answered, "Yes." All of appellants were subsequently informed that the policy had been changed, and that appellee Ethel was designated as one of the beneficiaries therein. They also knew that she had been informed of the change.

Appellee's testimony upon this point differs slightly from that of appellants. She testified that the arrangement for the

payment of $10 per week was to continue *until* the policy was changed. No payments were made after the new certificate was issued. Appellee testified that, in caring for deceased, she relied upon the new certificate, and believed that one half of the proceeds thereof would be paid to her without any opposition from or interference by appellants, some of whom admit that they knew she was relying thereon, and that she expected to receive one half of the money. Appellee paid at least one assessment on the new certificate. Appellants paid other assessments during the illness of their father. After the new certificate was issued, some of appellants caused an agreement in writing to be prepared, obligating themselves to pay appellee five dollars per week, and, in consideration of her being made a beneficiary of the insurance in the sum of $1,000, to pay one half of all doctor, nurse, and hospital bills, one half of the assessments on the policy, and one half of all other necessary expenses incident to their father's welfare, and one half of the funeral expenses. The agreement further provided that, in the event that the payments by appellee exceeded $1,000, then appellants would pay all costs in excess of that sum. Appellee declined to sign this agreement, and it therefore never became effective.

Clarence E. Brown testified as follows:

''Q. You knew that Mrs. Farley knew that the change of beneficiary had been made in her favor? A. Yes. I knew that she was relying on the fact that she was a beneficiary under this policy, and my brothers and sisters were relying on that fact, in dealing with her. We took that fact into consideration. We drew this contract after the policy had been changed, and thought that it would take care of things. Q. You knew that she was taking care of your father and working as she was, knowing that she was to receive half of the insurance money, and you also knew that she was to receive the life insurance money. Is that not so? A. Yes.''

Appellants, or some of them, talked with their father, and knew his wishes concerning the insurance,—knew that appellee was caring for him, and that he was without other means of recompensing her therefor. They made no objection at any time to the change in beneficiary, either to the deceased or to appellee.

In substance, the above are the matters upon which appellee's plea of estoppel is based. We are convinced that appellants permitted appellee to assume the burden and responsibility of caring for their father in his last illness, with knowledge that she was relying upon the insurance money to reimburse and compensate her for the expense and labor involved, without protest upon their part. The record shows that she is a poor, hardworking woman. We assume, of course, that appellants are likewise industrious. They had, however, been long estranged from their father, and knew of his confidence in and affection for appellee. It was to her that he turned in his extremity. She did not desert or disappoint him. The equities in her favor are impelling. Appellants concede that they refused to continue the payments agreed upon, because of the provision in the benefit certificate for appellee. They permitted her to continue to care for her stepfather until his death, without even suggesting to her that they intended to contest her right to share in the insurance. Appellants, however, paid the funeral expenses of their father.

The doctrine of equitable estoppel is too firmly established in our jurisprudence, and has been too many times defined and applied, to require restatement or discussion. The citation of the following cases will suffice: *Anfenson v. Banks,* 180 Iowa 1066; *Schuetz v. International Harv. Co.,* 167 Iowa 634; *Des Moines Ind. Sch. Dist. v. McClure,* 170 Iowa 191; *Wright v. Lieth,* 146 Iowa 290; *Criley v. Cassel,* 144 Iowa 685; *Helwig v. Fogelsong,* 166 Iowa 715.

It is true that Brown was at the home of appellee, and that she was caring for him at the time the arrangement between her and the other beneficiaries was completed; but it cannot be said that she did not change her situation, or that she was not injured by the conduct of appellants. She continued, for months after the change of beneficiary, to keep Brown in her home and to administer to him. That she did this in reliance thereon, with the full knowledge of appellants, we think is quite conclusively shown by the evidence. Appellants' conduct amounted to a constructive fraud. They could not permit appellee to wait upon and care for their father, knowing that she was doing so in reliance upon the provisions of the certificate,

without informing her that they would contest her right to the insurance, and then, after the services had been completed, deny her right to any claim thereto.  The court below ordered a distribution of the fund in accordance with the terms of the certificate, upon the theory that appellee is the surviving child of the deceased.  Without expressing any opinion as to the soundness of this holding, we prefer to rest our conclusion upon the doctrine of estoppel.  The judgment and decree of the court below is, therefore, in all respects—*Affirmed.*

ARTHUR, C. J., PRESTON, DE GRAFF, and VERMILION, JJ., concur.