C. G. TICE, Appellant, v. L. T. SHANGLE, Appellee.

**BOUNDARIES:** Recognition and Acquiescence. A division line between adjoining tracts of land, definitely marked by the erection and maintenance of a fence, or other monument, and openly recognized and acquiesced in for more than ten years as the boundary, is, nothing else appearing, the true boundary, irrespective of the government lines, and irrespective of the secret purposes of the parties. So held as to a hedge fence.

*Appeal from Mahaska District Court.*—HENRY SILWOLD, Judge.

SEPTEMBER 29, 1917.

REHEARING DENIED JANUARY 15, 1918.

THIS action involves the right to maintain a dividing line between tracts of land owned by the parties, respectively, based on the theory of acquiescence. The opinion states the facts. Decree in the district court dismissing plaintiff's petition.—*Reversed and remanded.*

*J. C. Heitsman, S. V. Reynolds,* and *McCoy & McCoy,* for appellant.

*D. C. Waggoner, L. T. Shangle,* and *Burrell & Devitt,* for appellee.

GAYNOR, J.—The plaintiff's and the defendant's lands adjoin. The plaintiff is the owner of the East Half of the Northwest Quarter of Section 19, and the defendant is the owner of the Northeast Quarter of the same section. It is apparent, therefore, that the true government line dividing the plaintiff's land from the defendant's should pass north and south through the center of the section. The plaintiff's claim, however, is that, many years ago, a fence was erected, running north and south, dividing plain-

tiff's land from the defendant's; that this fence has been ac-
quiesced in as the line dividing their respective lands, for
more than the statutory period; that each has cultivated
up to this line as the dividing line, and has acquiesced in
it as such; that the defendant is attempting to change the
line by erecting a fence to the west of this established line,
and on plaintiff's land. The plaintiff, therefore, brings
this action in equity to compel the defendant to remove this
fence, so attempted to be erected, so far as erected, and to
restrain him from erecting or maintaining any fence west
of this original fence so claimed to have been acquiesced in
as the true line. The theory of the plaintiff is that he is
the owner of the land west of this original fence; that the
defendant is erecting, or attempting to erect, or has erected,
a fence at a point west of the true dividing line between
the plaintiff's and the defendant's land, and therefore on
the plaintiff's land. The plaintiff bases his right to main-
tain this action on adverse possession, and also on the the-
ory of acquiescence in the original line, as indicated by the
original fence; that the original fence has become the
dividing line between their lands; and that each owner is,
therefore, entitled to hold up to the fence on his side of
that line.

The disposition of this controversy involves the appli-
cation of the law of acquiescence. Plaintiff does not allege,
nor does he attempt to prove, where the original govern-
ment line was. He bases his claim to this land on the
theories above stated, and so brings this action to restrain
the defendant from passing west of this original fence line
so acquiesced in, and from erecting, or attempting to erect,
any fence as a division fence at any point west. In fact,
neither party in this controversy has shown or attempted to
show the existence of any original government corners; nor
does the record disclose any surveys made, with reference

to government corners or lines, for the purpose of ascertaining or determining where the original government corners and lines were. We are not, therefore, in a position to say from this record where the government established any of the corners along or on this Section 19. The plaintiff bases his contention solely on the ground that, a great many years ago, the owners of the tracts now in controversy established a line dividing these lands, or that a line was established dividing these lands; and that this line, so established, has been acquiesced in by adjoining owners for the statutory period of time; and that, therefore, without regard to government lines, the line so established and acquiesced in became and is the true dividing line between these parcels of land; that the line so established, so far as the original owners and their grantees are concerned, is the true dividing line. It is claimed that the original owners and their grantees have acquiesced in this line, and given evidence of their acquiescence by cultivating up to it on either side.

It is evident that the plaintiff must stand or fall upon this contention. If, as a matter of fact, there was an original line established and acquiesced in by the parties as a division line between these tracts of land for more than ten years, neither party can now disturb it; and in any controversy between the parties touching the division line, this line, so acquiesced in, must be treated as the true line between them; and each is entitled to the land on his side of the line, with a right to occupy and cultivate up to the line so acquiesced in.

The law that governs a case of this character has been so frequently considered by this court that it would seem unnecessary to restate it for the purposes of this case. Originally, the government fixed the lines by establishing corners. These corners and lines divided the land into government subdivisions, for the purposes of convenience

in sale and to identify a portion of land conveyed by the government. Ordinarily, people buy with reference to the original government corners and lines. The lands are usually described by governmental subdivisions. When so described, the location and territorial extent are determined by reference to the original government corners, as established, indicated in the original government survey; and those who so purchased are entitled; ordinarily, to claim by government description, and to have the lines dividing their land recognized accordingly. This does not, however, prevent adjoining owners from fixing their own lines, or agreeing upon lines which separate their land. It is on this theory that the rule of acquiescence has been adopted. Where adjoining lands have been divided by monuments marking a visible dividing line, and this line has been acquiesced in by the respective owners possessing and cultivating up to such line for the statutory period, they will not be heard to say afterwards that the line is not the one to be recognized as the dividing line between the land. This may be shown by express agreement, or by the conduct of the parties which clearly indicates an intent to recognize and hold the line so created as the true dividing line. This doctrine has repeatedly found recognition in this court. In *Miller v. Mills County*, 111 Iowa 654, it was said:

"It may be remarked that there is nothing about the government surveys entitling them to reverence. The original purpose was to enable the government to dispose of the public domain in parcels accurately defined. * * * But if the coterminous owners have adopted another line as their division line, and have occupied up to it and recognized it as such for a period of ten years, there appears to be no reason for not regarding it as the true boundary line, notwithstanding it is not that fixed by the government survey. * * * The authorities are abundant to the point that, when owners of adjoining lands have acquiesced for a con-

siderable time in the location of a division line between their lands, although it may not be the true line according to the calls of the deeds, they are thereafter precluded from saying it is not the true line. * * * The great current of authority sustains our conclusion that, in the absence of other controlling circumstances, the inference is conclusive that the division line between adjoining tracts, definitely marked by the erection and maintenance of a fence or other monuments, recognized by the owners as such, and up to which they have occupied and cultivated the land on either side more than ten years, * * * is the true boundary between them."

Recognizing and following this rule are the following cases: *Dwight v. City of Des Moines,* 174 Iowa 178; *McGovern v. Heery,* 159 Iowa 507; *Griffin v. Brown,* 167 Iowa 599.

About forty years ago or more, one Caleb Spain was the owner of land now claimed by the defendant. One Sexton owned the land claimed by the plaintiff. At the time Spain purchased this land, it was unenclosed, and was used by Sexton for pasturing his cattle, in connection with certain lands to the north, unenclosed. Sexton's land, at that time, had a fence running north and south between his land and the land purchased by Spain. At that time, much of the land around the land in controversy was unenclosed, and was used by the farmers for pasturing their stock. It seems that, at the time Spain purchased this land, and was about to enclose it, some controversy arose between him and Sexton as to the need of access to the land north of them for pasturing purposes. Spain put in a hedge fence, running from the south to the north line of his land on the west side, east of Sexton's fence. This made a lane between this hedge and Sexton's fence, which was used by both parties in driving cattle to the north to the open prairies. Thereafter, a road was opened, running east and west

along the south line of the land owned by Spain and Sexton, and connecting with a road to the east, running north and south. This gave both access to the pasture lands north, and removed any necessity for a lane fence between them, as before created. The Sexton fence then seems to have been abandoned, and the hedge fence built by Spain used as the line fence between their respective lands, each party cultivating up to Spain's hedge fence on his side, and both contributing to the maintenance of the fence until some time later, when Spain sold his land to Straughan. It seems that Straughan found that the hedge fence was not hog-tight, and therefore erected a fence up against the hedge fence to the east, Straughan says, with the purpose of moving it back to the true line whenever the hedge fence rotted out. Subsequently, the hedge fence became such that it was no longer useful in restraining stock, and was allowed to rot down, and was subsequently cut off. Thereafter, Sexton and his grantee, this plaintiff, Tice, cultivated up to the new fence, as built by Straughan. The record discloses that this old hedge fence, originally built by Spain, was at all time recognized as the dividing line between these two pieces of land. The stumps remained there, which rendered it difficult to cultivate up to the Straughan fence; although, after the fence was removed, both Straughan and, subsequently, Shangle, his grantee, defendant herein, cultivated only up to the fence erected by Straughan. Up to the time that Shangle purchased it, this old fence seems to have been recognized as the dividing line between these two pieces of land, and the purpose in the minds of the parties seems to have been to place this Straughan fence back upon the old hedge fence line, whenever the hedge fence became rotted out or removed, or it was thought that this could be done.

Straughan testifies that he put his fence along the east side of the Spain hedge for the reason that he didn't feel like

grubbing out the hedge, so he says "we set the posts on the east side of the hedge as near as we could;" that it was not his purpose to put it on the line, but his intention was to move the fence over on the true line as soon as the old hedge rotted out; that he had no knowledge of the true government line; that the hedge was there, and ran all along from the north to the south. After Straughan built this fence along the hedge, in order to have a hog-tight fence, it seems that Tice, who had then succeeded to Sexton's ownership on the west side, put in posts between the wires, and put on boards; and this for the purpose of having a hogtight fence. Straughan says he didn't care to grub the old hedge out, to see where the true line was; that he was satisfied with the line as then indicated. Straughan was asked these questions:

"Q. Now something has been said here, Mr. Straughan, about a hedge fence that was there. A. Yes, sir. Q. An old hedge fence, and then you later put up a wire or a board and wire fence? A. We just set the posts in there, and wire. Q. What was the fact as to whether the fence was put in on the correct division line between the two 40's? A. When we put that fence in, there was an old hedge fence there, probably 4 or 5 feet high, and the top was very wide, and I didn't feel like grubbing that hedge at all, and we set the posts in at the side. Q. Then it wasn't the intention to put that fence on the line? A. No; I supposed we would change that fence again; whenever the old hedge fence would rot out, we would put it back on the line. I supposed the old hedge was somewhere near on the line. Q. You thought that was something near it, and you farmed up to it? A. Sure. Q. And you treated it that way? A. Sure. Q. When you put in this fence on the east, you put in posts a rod apart, and three wires? A. Yes, sir. Q. And Tice put in some more boards? A. That is correct. Q. You let him put in the posts and

boards to make a hog-tight fence? A. Yes, sir. Q. And prevent trouble between you? A. Yes, sir. Q. And that fence has remained there until this controversy came up? A. Yes, sir. Q. And you made no objection? A. No, sir. I put my fence on the east of the hedge on my land so I wouldn't have to grub out that old hedge fence."

He was asked these questions:

"Q. Why didn't you go on the west side of that hedge fence? A. Well, as a rule, I aim to put my fence on the line; but, if there is an obstruction there, I generally put it on me. Q. That is what I say; you prefer to put it on your own land, instead of on the other fellow's? A. Yes, sir; that old hedge fence, I think, is on my land. Q. Do you know how many years it is since you put in this fence on the east of the hedge? A. Twelve or fourteen years."

One Wharton, who seems to have been familiar with this hedge and its location, way back in the time when the land was occupied by Spain and Sexton, when speaking about this lane that was used by Spain and Sexton to conduct their cattle to the open pastures to the north, was asked this question:

"Q. Did Spain and Sexton each set his fence back from the division line, and each give a portion of the lane between them? A. I don't remember; but there was a lane between them. Spain built a hedge and willow fence back on his side of the land running north. They used this lane about three years. After Spain and Sexton ceased to use this lane, Sexton attempted to raise a hedge fence on his part of the true division line between him and Spain, which hedge failed to make a good stand; and it was mutually agreed between them, after this hedge of Sexton's failed, that they should use the Spain hedge as a common fence between them. This arrangement was to continue until they saw fit to put the fence in on the true line. Spain's

hedge fence was built east of the fence originally con-
structed by Sexton, and it was there at the time Spain
bought this land."

It appears that this hedge fence, erected by Spain way
back forty years ago, was used as a division fence between
these pieces of land, at all times after the lane scheme was
abandoned, and each part cultivated up to it on his side;
that it continued as the dividing line between the lands
until Straughan erected his fence on the east; that there-
after, this hedge fence was cut down, and the ·Straughan
fence used as a dividing line, and each party aided in main-
taining this Straughan fence, and each on his side cultivat-
ed up to this fence, though it seems Tice had some difficulty
in cultivating over the stumps of the old hedge. Shangle,
who succeeds to Spain's and Straughan's rights, is attempt-
ing to shift the fence, or his west line, over to the west of
this old hedge fence; and this is what has provoked the
controversy. Ought he to be permitted to do it? We think
not. There is no evidence that the original fence, built by
Sexton on the east side of his land, the one that was there
at the time Spain purchased, was on the true line. There
is no evidence that, when Spain purchased his land and
built his hedge for the purpose of securing the lane to the
north, he did not build on the true government line. No
one seems to have taken the trouble to investigate either of
these matters, or to present any satisfactory evidence upon
either of these points. This fact is certain: that, after
the lane scheme was abandoned, both parties used this old
Spain hedge fence as a dividing line between their tracts
of land; that each cultivated, on his side, up to the hedge;
that, when Straughan built his fence on the east of this
hedge, it was placed there tentatively, and only for the
purpose of securing a hog-tight fence until such time as the
old hedge fence would rot down, or could be removed,—
grubbed out,—and the fence placed back upon the old hedge

line. We think this was recognized by both Straughan and Tice as the purpose in putting in this new fence. For far more than the statutory period, this record makes it fairly certain that both parties recognized this old hedge line fence as the dividing line between their property. It is true that there is some evidence that, at one time, Sexton planted a hedge to the west of this old hedge. Where this hedge was planted, or the purpose of planting it, is not made evident by this record. It proved a failure, was allowed to die out, and was lost. How long it remained there, what its character was, or the purpose of putting it there, does not appear, except that some witnesses have assumed to say that it was the purpose of Sexton to put it on the true line. But however that may be, we are satisfied to say that the parties hereto and their grantees recognized this old hedge fence as being the line fence between their respective tracts, and acquiesced therein for more than ten years before any attempt was made to question it. It was a permanent fence, and was never challenged, so far as this record discloses, until the defendant in this suit undertook to erect a fence to the west of this old hedge line.

Lines adopted by parties and acquiesced in for many years, as this record shows these parties acquiesced in this line, ought not to be lightly disturbed; and the secret purposes of the parties cannot be considered against their overt acts of recognition and acquiescence. No party seems to have known at any time, and no party seems to have cared to ascertain for himself at any time, where the true government line should be. They built their fences, they made their lines, they cultivated their lands up to these fences; and, under the rule of acquiescence hereinbefore stated, they ought to be held to these lines so established and acquiesced in, and should be held, as a matter of law and fact, to it as the true dividing line between their lands,

beyond which neither ought to be permitted to trespass.

We hold, therefore, that the true line between these parties, under the record made here, is the line of the old hedge fence; and the defendant should have been restrained and enjoined from going beyond that line, and from assuming any right of occupancy or otherwise to the west; and decree should be entered accordingly.

We have not discussed the question of adverse possession, since, in our opinion, it is not involved in this case. When the defendant passed west of the old hedge line, he was a trespasser, and plaintiff is entitled to the remedy sought against him. The case is, therefore,—*Reversed and remanded.*

LADD, EVANS, and SALINGER, JJ., concur.