ANNABELLE FLYNN LYNCH, Appellee, v. NORTHWESTERN LAUNDRY et al., Appellants; DES MOINES IMPROVEMENT COMPANY, Intervener, Appellee.

**BOUNDARIES:** **Establishment — Mutually Maintained Fences and**
1 **Occupancy.** Adjoining owners may not dispute the *finality* of a boundary line to which they have occupied for more than ten years, and on and along which they have, for a like period, erected fences and other monuments, even though such mutually maintained line varies from the surveyed or platted line.

**COSTS:** **Persons Liable—Defendant Without Interest.** Costs may not
2 be taxed to a person who disclaims all interest in the action, and who is, in fact, made a party to the action because he is the husband of a party in real interest.

*Appeal from Polk District Court.*—LAWRENCE DE GRAFF, Judge.

SEPTEMBER 19, 1922.

ACTION to establish boundary line between two lots. The line contended for by plaintiff and intervener was decreed to be the true boundary line. Facts appear in the opinion. Defendants appeal.—*Affirmed in part; reversed in part.*

*Henry & Henry,* for appellants.

*W. H. McHenry* and *Miller, Parker, Riley & Stewart,* for appellees.

ARTHUR, J.—I. The question for decision is whether the platted lot line of the properties in question, or a line a fraction over two feet east of the platted lot line, is the true divisional and boundary line of the properties.

1. BOUNDARIES: establishment: mutually maintained fences and occupancy.
Prior to 1880, a man by the name of Stone, and his wife, owned Lots 3 and 4 in Block 26, Campbell & McMullen's Addition to Fort Des Moines, now included within the city of Des Moines. The wife held title to Lot 3, and the husband had the title to Lot 4. In November, 1880, the Stones conveyed Lot 3 to W. W. Witmer, and in the same year, Witmer conveyed to Polk and Hubbell, and in May, 1887, Hubbell conveyed his interest to Polk. J. S. Polk having died in 1907, appellant Mildred P. Hippee became the owner of Lot 3, under the will of Polk, and now owns said lot.

In November, 1887, the Stones conveyed the east half of Lot 4 to J. M. Coggeshall. In January, 1919, the heirs of Coggeshall conveyed to plaintiff, Annabelle Flynn Lynch. On July 9, 1919, Annabelle Flynn Lynch sold, by written contract, to the Des Moines Improvement Company. Afterwards, in obedience to decree entered in a suit in equity in the Polk district court, April 15, 1920, Lynch conveyed to Des Moines Improvement Company, under date of July 31, 1919.

Appellant Northwestern Laundry Company held a lease from appellant Mildred P. Hippee of Lot 3. Appellant A. Sugarman engaged in a contract with the Laundry Company to erect a building for the Laundry Company on Lot 3, and began excavating for a basement of the building up to the platted line between Lots 3 and 4. Excavation across and beyond the line which plaintiff and intervener claim to be the true divisional line between Lots 3 and 4, a line some two and a fraction feet east of the platted lot line, precipitated this litigation.

Plaintiff then began this action to enjoin trespass upon her property, and to have established the line claimed by her as the true divisional or boundary line of said Lots 3 and 4, or rather, Lot 3 and the east half of Lot 4. Afterwards, the Des Moines Improvement Company, as purchaser of the east half of Lot 3 from plaintiff, intervened, and asked to be subrogated to all the rights of plaintiff and her preceding grantors, and joined in plaintiff's prayer for relief. A temporary injunction issued, restraining defendants from removing any soil or trespassing beyond the line claimed by plaintiff and by intervener to be the true line. On December 31, 1920, on final hearing, the

court found for the plaintiff and the intervener, made the injunction permanent, and established as the boundary line between the two properties the line contended for by plaintiff and the intervener, namely, a line 2.53 feet east of the platted lot line. From this decree this appeal is prosecuted.

II. The court found that, for considerably more than 10 years last past, the division line between the east half of Lot 3 and Lot 4 had been on a line east of the platted lot line dividing said lots, and that said division line has been acquiesced in and valuable improvements with respect thereto have been made by the owners of said lots and their respective grantors for such a period of time as that said division line, so acquiesced in, has become and should now be established as the true boundary line between the properties. Decree was entered, establishing the line contended for by plaintiff and intervener, describing the location of the line by measurements.

To sustain the claim of plaintiff and intervener, evidence was introduced to prove, and we think it does establish, that the boundary line between the two tracts consisted of a fence, running from the north line of the lots south to a barn, which stood at the rear end of Lot 3; and that from that point the west line of the barn continued the line of the fence to the alley, and served as a boundary separating the properties. It was also shown that the fence was connected to two posts at either end of the east line of a porch upon the house which has stood for 50 years, and is now there, on the east half of Lot 4. This porch extends some two and one-half feet east of the east foundation line of the house, and the east line of the porch formed part of the boundary line. The evidence shows three distinct monuments marking this line claimed by plaintiff and intervener to be the true boundary line: the fence, the barn on Lot 3, and the porch of the house on the east half of Lot 4. These three monuments stood for many years. The barn on Lot 4 burned, but was rebuilt by Polk, while he owned the lot, on the same line. The fence, originally erected more than 30 years ago, decayed, and was rebuilt on the same line, and stood until recently. The house, built over 50 years ago on the east half of Lot 3, still stands.

H. H. Coggeshall, son of J. M. Coggeshall, testified to his

father's obtaining the east half of Lot 4 from the Stones in 1888, and that he and his mother and two brothers succeeded to the ownership of the property when his father died, in 1889, and of their having possession and control of the property until it was conveyed to plaintiff, in 1919; that he knew J. S. Polk, who owned Lot 4; that Polk owned and looked after it as long as he could remember.

"There was a fence between our lot and Polk's lot. I would say it was there 20 some years. I can remember back 20 years. I am 43 years old."

He said that nothing had come up until recently as to whether the fence was on the correct line between the two lots; that the fence was taken down six or seven years ago; that Mr. Polk built a barn on Lot 4, and the fence and the west line of the barn were on the same line; that he supposed all the time that the line between the two lots was where the fence was; that Mr. Polk never asserted anything to the contrary; that he and his folks claimed to own only to the fence line, and supposed the fence was on the line.

Mrs. Maggie Shead, who has lived in the house on the east half of Lot 4 since 1890, testified:

"I remember of a fence east of the house between our lot and the Polk lot. It was there when we moved in there. Such fence was about two feet east of the brick foundation of the house, and right up to the porch line, even with the porch line. It began at the street, and ran back to the barn, and the barn made the line from there to the alley. During all of the time I lived there, I occupied the lot up to the line of such fence. No one on the other side of that fence ever made any objection to the fence as a division line, or undertook to remove it, or anything of that kind. About five years after we moved in there, it rotted down, and my husband tore it down and built it new from the street back to the barn again, on the same line. The porch line still stands, and that was the old line. The line of the porch was the line of the fence. The barn was torn down about a month ago, when they began this excavation. During the time I was there, I never heard a word of objection or protest from the property owners east of me as to that fence line's being the division line between these two properties."

She further said that the barn on Lot 4 burned down about 20 years ago, and was rebuilt in the same place and on the same line by Mr. Polk.  Mrs. Shead further testified:

"We moved into that house [on the east half of Lot 4] in 1890.  These planks [of the porch] were nailed to the fence. The post that was there this morning at the northeast corner [of the porch] was one of the old posts of the fence."

James Hughes testified that he had lived in Des Moines since 1882; that he was familiar with the lots in question for 50 years; that the old house where Mrs. Shead lived, on the east half of Lot 4, has been there for 50 years; that the fence running along east of the house was there when he first knew the place, 50 years ago; that he remembered its being blown down and rebuilt and maintained there about 40 years; that the barn on the back end of Lot 4 burned at one time, and was rebuilt by Mr. Polk; that the fence and the barn were there 40 years, anyway.

Emil Schnabel testified that he had lived in Des Moines since 1881, and knew J. S. Polk and J. M. Coggeshall; that he lived for four or five years on Lot 3, as a tenant of Mr. Polk's.

"There was a fence between the two properties, which fence started from Grand Avenue and extended back to the barn.  It was a board fence.  A barn back on the alley on Lot 4 was a part of the fence.  That is, the west line of the barn and the fence are the same line.  It was there all the time I lived there.  The fence was treated as a dividing line between the two properties."

He testified that, as the tenant of Polk, he took possession to the fence line; that Mrs. Shead was in possession on the other side, up to the same line; that, after he lived on Lot 3, he lived for some 10 years on the east half of Lot 4; that the fence and barn remained there all the time he was there; that, during the years while he was there, no question ever came up, to his knowledge, as to the fence's being the dividing line.

John F. Gill testified that he had known the properties in question for 37 years; that the house on the east half of Lot 4 had been there in the same condition, to his knowledge, for about 30 years.

"I remember there was a fence along the east side of the

house running to the alley. I remember the barn at the south end. The fence was built up to that barn. The fence between the two properties was there, to my knowledge, more than 15 years.''

James A. Sullivan testified that he occupied the barn on the back end of Lot 4 for some time; that there was a fence running north to the street from the barn.

Charles Saverude testified that he had known the lots during the last 22 years; that the house on the east half of Lot 4 had been there as long as he could remember; that there was a fence between the properties; that the west line of the barn on Lot 3 was the line of the fence; and that he knew of the barn's being there 21 years.

Appellants offered no testimony to dispute testimony of appellees that the fence was on the line a little east of the platted lot line between Lot 3 and the east half of Lot 4, and that the west side of the barn located in the southwest corner of Lot 3 joined with the fence and continued the fence line south to the alley, and that the east line of the porch on the house located on the east half of Lot 4 was flush with and formed a continuation of the fence line.

On cross-examination of plaintiff's witnesses, counsel for appellants brought out that they had never heard of any dispute or question as to where the boundary line between the lots was; that they never heard or knew of anybody's claiming that the house on the east half of Lot 4, or any part of it, or the barn on Lot 3, or the fence, extended over and beyond the platted lot line, until this litigation arose.

Appellants offered testimony to support their position that the Des Moines Improvement Company did not buy the east half of Lot 4 from Annabelle Flynn Lynch, or make a contract of purchase, relying upon any marked boundary line; that all that the Improvement Company knew, through its purchasing agent, was that it was buying the east half of Lot 4; that it knew that there was a dispute between Lynch and Hippee over two and a fraction feet of ground lying beyond the platted lot line; and that it was told that Lynch was not selling that two and a fraction feet; and that, consequently, Lynch did not convey and the Improvement Company did not receive the strip in con-

troversy, lying east of the platted lot line.   The record does not
support appellants' position.   The record shows that Annabelle
Flynn Lynch entered into a contract with the Des Moines Im-
provement Company to sell the east half of Lot 4, on certain
terms; that dispute arose as to whether the strip in controversy
was a part of the purchase, and Lynch refused to convey the
strip, contending that she had only sold the east half of Lot 4,
as bounded by the platted lot line.   The issue tried in the cause
was whether the disputed strip should be conveyed; and un-
doubtedly, finding the issue with the Des Moines Improvement
Company, and directing conveyance, were tantamount to a spe-
cific finding that the Des Moines Improvement Company be-
came the owner of the disputed strip, if it should be determined
that such strip belonged to the east half of Lot 4,—that is, that
the Improvement Company purchased all of the ground in-
cluded in the description, the east half of Lot 4.   Such decree,
entered on April 15, 1920, precludes appellants from success-
fully claiming that the Des Moines Improvement Company did
not purchase and receive conveyance from Lynch of the strip
of ground in dispute, as being a part of the east half of Lot 4,
if it does belong to it.   The court having decreed that Lynch
should convey to the Des Moines Improvement Company, and
she did so convey, the east half of Lot 4, by such conveyance
the Des Moines Improvement Company received from Lynch
all the property which Lynch had received from Coggeshall.
That is, it received all the property which Lynch and Coggeshall
and their predecessors in title had acquired by the agreement
or acquiescence of the respective owners of the adjoining prop-
erties in a visible boundary line between the properties when
they erected and maintained the fence mentioned in the evi-
dence, and the barn and porch in the same line as the fence.   It
is notable that Lynch sought to have inserted in the deed from
her to the Des Moines Improvement Company a clause, to wit:

"This conveyance does not include any land outside of the
boundary line of Lot 4, as shown by the record plat of Camp-
bell's & McMullen's Addition."

Inclusion of such clause in the deed was refused.   Thereby,
the court decided that the conveyance did include all that Lynch
owned, and that, if she owned the strip in controversy, the con-

veyance included it. The very question litigated and determined was whether Lynch should be permitted to retain this strip of ground, or should be compelled to convey it to the Des Moines Improvement Company. The court compelled Lynch to convey the property to the Des Moines Improvement Company, and by the same description as that used in the deed from Coggeshall to Lynch. This, we think, precludes appellants from successfully claiming that the Des Moines Improvement Company did not receive conveyance of this disputed strip of ground, if it is a part of and belongs to the east half of Lot 4.

However, the controlling question to be determined on this appeal is: Where these adjoining landowners and their grantors have, for more than ten years, improved and occupied their properties with respect to a line definitely marked by a fence and other monuments, will they be heard to say now that such line is not the true boundary line between their respective properties?

We reach the conclusion that the adjoining owners had definitely marked the division line between them, by erecting and maintaining the fence and other monuments for a long period of time, much longer than ten years, up to which said adjoining owners had occupied and improved for the entire period; that the owners have acquiesced in the fence line as the true boundary line; and that appellants are estopped from asserting that it is other than the true boundary line. Such is our holding in *Miller v. Mills County,* 111 Iowa 654; *Lougee v. Shuhart,* 127 Iowa 173; *Bradley v. Burkhart,* 139 Iowa 323; *Tice v. Shangle,* 182 Iowa 601. In *Miller v. Mills County,* supra, we said:

"If the coterminous owners have adopted another line as their division line, and have occupied up to it and recognized it as such for a period of ten years, there appears to be no reason for not regarding it as the true boundary line, notwithstanding it is not that fixed by the government survey."

The decision of this case must be controlled by the doctrine announced in *Miller v. Mills County,* supra, and other cases holding similarly.

III. Question is raised as to taxation of costs against George B. Hippee. The court below entered judgment for costs

against both Mildred P. Hippee and George B. Hippee, her hus-
band. George B. Hippee has appealed sepa-
rately from the judgment against him for costs.
George B. Hippee, as husband of the lessor,
Mildred Polk Hippee, joined in the lease made by her to the
Northwestern Laundry Company, appellants, solely because of
his inchoate dower right in the property. He had nothing what-
ever to do with the possession or ownership of the strip of ground
in dispute, and disclaimed, in a separate answer, any interest in
the suit or in the property involved, except only his interest as
husband of Mildred Polk Hippee, owner of Lot 3. Judgment
for costs should not have been entered against him, and such
judgment is reversed.

*2. COSTS: persons liable: defendant without interest.*

With this exception, the decree and judgment of the court
below is affirmed.—*Affirmed in part; reversed in part.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.

DE GRAFF, J., takes no part.