ALICE TAYLOR, Appellee, v. C. A. OLMSTEAD, Appellant.

· TAXATION: Tax Title—Acquisition by Owner—Effect. An owner of
1 land who takes a tax deed to his own land simply effects a *redemption* from the tax sale. He acquires no better title than he before possessed. (See Book of Anno., Vol. 1, Sec. 7272, Anno. 28 *et seq*.)

LANDLORD AND TENANT: Leases—Estoppel of .Tenant. A lessee in
2 possession will not be heard to assert against his lessor that he never

intended to carry out his agreement to surrender the premises and every part thereof, on the termination of his lease. (See Book of Anno., Vol. 1, Sec. 10158, Anno. 1 *et seq.*)

**BOUNDARIES: Ascertainment—Acquiescence for Ten Years.** Bound-3 ary lines between adjoining owners of land become conclusive by ten years' mutual acquiescence therein. (See Book of Anno., Vol. 1, Sec. 12306, Anno. 10 *et seq.*)

Headnote 1: 37 Cyc. p. 1473. Headnote 2: 35 C. J. p. 1239. Headnote 3: 9 C. J. p. 245.

*Appeal from Pottawattamie District Court.*—E. B. WOODRUFF, Judge.

DECEMBER 15, 1925.

REHEARING DENIED MARCH 19, 1926.

SUIT to establish a boundary and to quiet title. Decree for plaintiff. Defendant appeals.—*Affirmed.*

*Kimball, Peterson, Smith & Peterson,* for appellant.

*Tinley, Mitchell, Ross & Mitchell,* for appellee.

MORLING, J.—The plaintiff is the owner of Lot 2, containing about 7 acres, and the defendant, of the lot adjoining it on the south, Lot 3, containing about 11 acres. The dispute is over a strip about 55 feet wide, running east and west along the boundary between these two lots. A deed for Lot 2, described, however, by metes and bounds, was made by Ernest E. Hart to plaintiff on January 29, 1908. Plaintiff's purchase apparently was made sometime before that date. When plaintiff purchased, D. R. Olmstead, the father of the defendant, was in possession of both lots, and was claiming and evidently had an equitable interest in both. Defendant testifies that his father had bought Lot 2 on contract, and rented it from Mr. Hart, the last two or three years that he had it, but that:

"He had an arrangement with Mr. Hart by which he was to sell it and get credit for all over a certain price. All he got from the Taylors over a certain price went to his credit."

He also says that he and his father were using the property when they got deed from his uncle in 1914.

·''We had been using it eight or ten years or more. We were using it at the time of the lawsuit with the· Taylors in 1920 [1911?]. We were using it at the time the Taylors bought the land. My father and I continued to use it until I bought it.''

Plaintiff testified, and it is not disputed, that D. R. Olmstead sold Lot 2 to her. At that time, and ever since, there was a house on the disputed strip. D. R. Olmstead, at the time of the purchase, measured off from the house 25 feet south, and put a stake there, telling plaintiff, ''This is your line.'' At the same time, he agreed to put in a cistern and gutters from the house, which he did. The cistern is about 5 feet north of the house. From the time of plaintiff's purchase, plaintiff and D. R. Olmstead used and.occupied their respective premises to the line marked by the stake. In 1909 or 1910, or possibly in 1911, the plaintiff built a permanent fence along this line. About this time, each of the parties had a survey made. According to this survey, the line would be located north of the house and over the cistern and 55 feet north of the fence located by D. R. Olmstead. D. R. Olmstead tore down the fence, and sued the plaintiff and her husband to recover possession of the strip. He was defeated in the district court, appealed to this court, and the decree against him was here affirmed. *Olmstead v. Taylor,* 177 Iowa 186. The proceedings in that case are made a part of the evidence here. The present defendant was then living on Lot 3. He admits that he knew all about the case, and might have had something to do with appealing it, and probably paid the expenses, though he says that the reason was that his father was raising produce on the place, and he sold it and had the money. Defendant knew that the plaintiff was occupying the property in .1908, 1909, and 1910. The legal title to Lot 3 after October 13, 1911, was in W. E. Olmstead, an uncle of the defendant's. On November 20, 1912, W. E. Olmstead declared a forfeiture of a contract with D. R. Olmstead for the purchase of Lot 3, and on July 15, 1914, conveyed Lot 3 to defendant, C. A. Olmstead.

C. A. Olmstead declined to pay his taxes on Lot 3 for the year 1916, as he says:

"Because I wanted to get additional title to my Lot 3 * * * I understood I had a good title. I wanted to get a better title, because you can't have a title that is too good, I guess. * * * The only part of my 11.35 acres that I was having any trouble about the title was this strip of ground. In order to get that title, I let the property go to tax sale. * * * This strip of ground was not separately assessed. * * * "

The tax sale certificate was issued to the holder of the mortgage on Lot 3, and later assigned to the defendant, who served on himself notice to redeem, and took a tax deed to himself for Lot 3, dated February 18, 1921. On March 18, 1921, the defendant received from the plaintiff a written lease of Lot 2, "together with all the buildings and improvements on the same from the 1st day of April, 1921, to the 1st day of April, 1922, * * *. The lessee covenants that he will carefully guard and protect said premises, with the buildings, gates, fences * * * from all damage * * * that he will keep the buildings, glass, fences, in as good repair as they now are."

After receiving this lease, defendant took possession of the plaintiff's premises, including the house and the disputed strip, and proceeded to tear down the fence. He said:

"I knew the Taylors were claiming down to the fence when I bought Lot 3. I never raised any question about it until I got my tax deed."

The petition in this case was filed April 12, 1922.

So far as shown, the owners of the legal title to Lot 3 never questioned the line as used and occupied by the adjoining owners, and as marked by the fence, for more than ten years. The claimant to the equitable title disputed the line by tearing down the fence and bringing suit, but in his suit the title was quieted in the present plaintiff.

1. Lot 3 consisted of the tract which the defendant actually owned and enjoyed, rather than the tract defined by

the original plat. *Johnson v. Trump,* 161 Iowa 512. Defend-
ant was merely begging the question when, by

**1. TAXATION: tax title: acquisition by owner: effect.**

neglecting to pay his own taxes on his own Lot 3, and going through the formality of getting a tax deed to Lot 3, he claimed to get a larger tract than the Lot 3 he actually owned and possessed. The question still remained, What did Lot 3 consist of? It is obvious that the defendant or his mortgagee was under the duty of paying the taxes on Lot 3, and they could not, by neglecting to pay in the regular way, and by paying on a tax sale certificate, instead of on a receipt, by their own neglect of duty to the state, acquire from the state a better title to their property than they previously possessed. The assignment of the certificate to defendant was a redemption. *Blumenthal Bros. & Co. v. Culver,* 116 Iowa 326.

2. The defendant got possession of the disputed strip from the plaintiff under a lease, which is stated in the record before us to contain all of the usual agreements of a written

**2. LANDLORD AND TENANT: leases: estoppel of tenant.**

lease for farm land, as well as to contain the covenants previously noted. The law will not permit the defendant, while enjoying the fruits of the lease, to deny that he honestly intended to regard its covenants, and to restore to the plaintiff, on its termination, possession of the leased premises in the condition in which he received them. While he is occupying the property under a lease from the plaintiff, he cannot deny her title. *Stout v. Merrill,* 35 Iowa 47; *Bowdish v. City of Dubuque,* 38 Iowa 341.

3. For more than ten years, the respective tracts of land were used and occupied up to a well defined boundary. For more than ten years before the defendant tore it down, the

**3. BOUNDARIES: ascertainment: acquiescence for ten years.**

fence marked this line. If there were doubt about the location of the fence for the full ten years, still the defendant obtained possession under the lease, and could not, when he took possession under the lease, gain any advantage while holding under the lease. The attempt of the equitable owner to dispute the line was participated in by the defendant, and by his own admission he was using the land with his father, and was presumptively equally interested. The effort of the equitable owners to alter

the actual boundary was defeated by the decree which established the title in plaintiff, and barred them from further contesting it.   The legal owners under whom defendant now claims, acquiesced.   It is clear that the defendant has no standing now to question the boundary as it has been actually located during these years.   *Miller v. Mills County,* 111 Iowa 654; *Hughes v. Rhinehart,* 190 Iowa 560; *Corey v. City of Fort Dodge,* 118 Iowa 742; *Lynch v. Northwestern Laundry,* 194 Iowa 317; *Tice v. Shangle,* 182 Iowa 601; *Downing v. Glassburner,* 200 Iowa 715; *Klinkefus v. Vanmeter,* 122 Iowa 412; *Rowell v. Weinimann,* 119 Iowa 256; *Anderson v. Buchanan,* 139 Iowa 676.

4.   The defendant assigns error in fixing the rental at $150; but this assignment is not argued, except as it inheres in the points discussed.

The decree is just, and it is—*Affirmed.*

FAVILLE, C. J., and EVANS and ALBERT, JJ., concur.