IRVIN C. BROWN, Appellant, v. FRED W. BERGMAN et al., Appellees.

BOUNDARIES: Acquiescence—Immaterial Matters. If landowners have, in truth and in fact, acquiesced, for more than ten years, in a fence as the boundary line between their adjoining lands, it becomes quite immaterial (1) who built the fence, or (2) to what extent the parties are assessed on their lands, or (3) whether, on a government survey, one of the parties would have more acreage and the other less acreage. (See Book of Anno., Vols. I, II, Sec. 12306.)

Headnote 1:   9 C. J. p. 247.

Headnote 1:   4 R. C. L. 130.

*Appeal from Bremer District Court.*—M. F. EDWARDS, Judge.

DECEMBER 13, 1927.

Action to establish corners and boundaries.  Judgment for defendants.  Plaintiff appeals.—*Affirmed.*

*Pike, Sias, Zimmerman & Frank,* for appellant.

*Sager & Sweet* and *Arben L. Young,* for appellees.

MORLING, J.—The principal question is whether the boundary in question has been fixed by acquiescence, as defendant claims.  The plaintiff and the defendant Fred W. Bergman are the owners of adjoining quarter sections, that of the plaintiff being the northwest, and that of the defendant the southwest quarter of the section.  The disputed boundary is, of course, the east and west line between these quarters.  For the sake of brevity, Fred W. Bergman will be considered as sole defendant.  His father acquired the southwest quarter about 1890.  There was at that time, and has ever since been, on the same line in controversy a fence, which to all appearances was, and until this controversy arose was at all times recognized as, the partition fence.  Defendant's uncontradicted testimony is:

"There was an arrangement made about keeping the fence in repair and rebuilt on the line there between the land that was owned by my father and the owners of the land now owned by Mr. Brown [plaintiff] during all these years.  That arrangement was that we were to rebuild and keep the fence in repair on the west end, and the owners of the Brown land were to keep up the fence on the east end. * * * And so, during that time, my father built and kept up the west half of that line fence * * * and the owners of the northwest quarter built and kept up the east half of that fence, and father did that ever since the time that he became the owner of the southwest quarter and until the time that that land was passed to me.  And since then, I have also maintained and kept up that same half of that line fence, all the time. * * * The owners of the land now owned by Mr. Brown, they maintained during that time the east half of that line fence.  During the last about thirty years, the owners of the land now owned by Mr. Brown have kept up, repaired, and maintained the east half of that line fence located where it is now. * * * during that time, the fact is that the east half

of that line fence has been repaired by the owners of that land; by Mr. Schellhorn, for one, and by Mr. Pries and Tierney. * * * That fence stands now, with reference to where the fence was 30 years ago, in the same place. * * * The very first time that this line between the two properties has ever been questioned as being the true dividing line between them in the 30 years that I have known the land, was after the time that Mr. Brown got the land on the other side of the fence there.''

Plaintiff's contract to purchase this land is dated July 31, 1919, and his deed is dated March 1, 1920. Defendant further testified:

''For 30 years at least, that I know of, that fence has been recognized and maintained by the owners of the two pieces of land as the dividing line that divided the two farms, and Mr. Brown was the first who ever questioned that as being true. Mr. Brown first questioned it something like 3 years ago; so that, for at least 28 years before Mr. Brown ever said anything about it, that fence, located where it is now, was recognized and maintained by the owners of the land on each side of it as being the dividing line between the two properties.''

The evidence is that the fence is in line with the corresponding partition fences of adjoining farms. A number of witnesses corroborate defendant's testimony, and, as stated, it is not contradicted. There is no direct evidence whatever of the physical location of quarter-section corners, or, for that matter, of section corners. Plaintiff claims that there is a shortage in his land and an excess in defendant's land, if measured according to the fences. He has offered no evidence to support this assertion. He refers, however, to a claim filed by him against the estate of his vendor, in which he alleges that he had a survey made, and ''then for the first time learned and discovered that the farm conveyed to him by the defendant [decedent?] C. E. Noonan actually contained not to exceed 153.53 acres of land, and that there was a shortage in the acreage of the farm of 6.47 acres.'' The plaintiff makes the same allegations in a petition filed by him against the grantor of plaintiff's vendor, based upon the deed of such grantor to plaintiff's vendor. If we give to plaintiff the benefit as evidence of his assertion made in those cases, the allegation is that he had a survey made; that the farm conveyed to him contained not to exceed 153.53 acres, and that

plaintiff, as he further alleges in the petition last mentioned, never became seized or possessed of 160 acres of land, as agreed, "and never acquired title to or possession of the full 160 acres of land, but the acreage of said farm was short in the amount of 6.47 acres, whereby this plaintiff was damaged in the amount of $1,413.31." Plaintiff's claim is that his quarter should contain 160 acres because the government plat of the township, which he introduced in evidence, represents the section as containing 640 acres. We pass the rule that the field notes, and not the plat, are the best evidence. On plaintiff's own allegations in those former proceedings, he never became seized or possessed of more than the 153.53 acres. It is his own assertion that he did not get title to the land which he is now claiming, and this assertion he bases upon the survey which he claims to have had made, but has not introduced in evidence.

Plaintiff contends that the evidence does not show who erected the fence, or how, or under what circumstances it came to be erected. Literally speaking, this is true. But the evidence does show, without contradiction, that, by whomever and under whatever circumstances erected, it was adopted and acquiesced in by the owners of the land as defining the boundary line, and as being a partition fence. The evidence is undisputed that the adjoining owners occupied and farmed the land to the fence. Neither of them made claim to any land beyond the fence. The adjoining owners repaired and maintained the fence, each his own apportioned part of it. Plaintiff urges here that this, so far as plaintiff's land was concerned, was all done by tenants. Plaintiff's vendors, however, were the owners of the reversion, and the lessors. They put their tenants in possession of the land up to the fence, and no farther. It was that that they leased, and of that (presumptively) that they had and claimed the rents and profits and the reversion. If the fence encroached upon their land, they, notwithstanding the leases, might have maintained an action for its removal. *Brown v. Bridges,* 31 Iowa 138; 35 Corpus Juris 1219; *Babley v. Vyse & Gatchie,* 48 Iowa 481; *Arneson v. Spawn,* 2 S. D. 269 (49 N. W. 1066). Plaintiff says that there is no evidence that defendant ever made any claim to anyone that the conveyance was the true boundary line. Its very existence, defendant's occupation and use of the land up to the fence, and his maintenance of the fence, were

open and obvious information of his possession and of his claim of ownership. It is said that defendant disclaimed anything more than what his deed called for. Defendant's claim was that his deed called for the quarter section as marked off by the fence, and as so used and occupied. The deed to defendant conveyed the quarter section as it was demarked, recognized, owned, and occupied, and as bounded by acquiescence. *Johnson v. Trump,* 161 Iowa 512; *Downing v. Glassburner,* 200 Iowa 715; *Taylor v. Olmstead,* 201 Iowa 760.

The assessment rolls, assessments, and taxes paid by the adjoining owners were respectively for 160 acres, but it remains true that each owner was returning to the assessor and paying taxes upon the tract which he owned and enjoyed, whether the acreage was correctly specified in either case or not. Of course, the returned assessment and payment of taxes are evidentiary circumstances, but the value of them, as such, is variable. *Keller v. Harrison,* 139 Iowa 383. Defendant's testimony is:

"I did know or think that my quarter section or my land overran more than just exactly the 160 acres. I had never had it surveyed, to know just how much it overran an exact 160 acres. For about 30 years, I have thought or had the idea that within my fence there was more than 160 acres. The land I have was willed to myself and my brother, and then, later on, I bought my brother's interest in it from him. He knew, before he sold it to me, that there was more than an exact 160 acres in the farm, and the deal was made that way, and with that understanding. * * * I am assessed for 160 acres, I think, * * * that is, including the road, I reckon; so that, taking out the road, I am really assessed for about 156 acres. Q. And that, as a matter of fact, is the acreage that you have given yourself to the assessor for the last two assessments, at least, isn't it? A. * * * He makes his own assessments. It is true that for the assessment made for the years 1925 and 1923 on my real estate I signed an assessment roll on which the acreage on my land was stated, and I also swore to those assessment rolls, I think. And those two assessment rolls, for those years that I mentioned, which I signed and swore to, gives the acreage on my land as 160 acres, less the deduction for the road. * * *"

He does not say that he knew that plaintiff's quarter section contained less than his. If defendant's ownership extended to

the fence, the acreage specified in the tax proceedings cannot operate to diminish it. It is said that defendant disclaimed any land other than that which his deed called for. He also says that he claimed the southwest quarter, according to his deed, and always claimed that the line as marked by the fence was what he got by his deed; that the fence was his north line, and nobody ever questioned it until plaintiff did.

But, without prolonging the discussion, the case calls merely for the application of our repeated adjudications that the reciprocal recognition of and acquiescence in a fence as marking the boundary, through occupation and exercise of exclusive dominion thereto by the respective adjoining owners for a period of ten years, raise a conclusive presumption of an agreement upon the line so marked as the boundary. *Miller v. Mills County*, 111 Iowa 654; *Quinn v. Baage*, 138 Iowa 426; *Keller v. Harrison*, 139 Iowa 383; *Johnson v. Trump*, 161 Iowa 512; *Andrews v. Meredith*, 131 Iowa 716; *Griffith v. Murray*, 166 Iowa 380. This is true notwithstanding the statement of defendant in testimony that he intended to claim no more than his deed gave him. *Bradley v. Burkhart*, 139 Iowa 323.

*Benjamin v. O'Rourke*, 197 Iowa 1338, *Dwight v. City of Des Moines*, 174 Iowa 178, *Davis v. Angerman*, 195 Iowa 180, and *Cooper v. Horridge*, 200 Iowa 711, are, on the facts involved, not in point.—*Affirmed*.

EVANS, C. J., and DE GRAFF, ALBERT, and WAGNER, JJ., concur.