Luke E. Hart, Appellant, v. Sam Worthington et al., Appellees.

No. 47123.

December 16, 1947.

Grant L. Hayes, of Mount Ayr, for appellant.

Emmet R. Warin, of Mount Ayr, for appellees.

BLISS, J.—On March 16, 1887, Jerry Shay and wife executed to the Chicago, St. Paul & Kansas City Railway Company, in consideration of the location of a station and railway depot on Section 22, Township 68, Range 31, a warranty deed conveying to the grantee all that part of the real estate lying within 50 feet of and at a right angle to the center line of the railway over and across Section 22, and extending a further 100 feet between stations 4519 to 4539, a distance of 2,000 feet. Later this railway line became a part of the Chicago Great Western Railway Company. The town of Maloy was laid out in said section. The track and right of way as surveyed and improved extends in a southwesterly-northeasterly direction.

To aid in the statement of the contentions of the parties and of the evidence, and for·the convenience of the reader, we set out a plat, not drawn to scale, and improvised from exhibits and testimony.

Due north is toward the upper left-hand corner. The parallel lines 7–8 are the main track. The three numbered parallel lines intersecting the track represent an east-west public highway, 66 feet wide, of which line 2–1 is the north highway line, line 3–4 is the center of the highway and is also the east-west quarter-section line, and line 5–6 is the south boundary of the highway. The perpendicular line X–V, partly broken and partly solid, represents the west boundary line of the right of way, and was surveyed as 150 feet west of and parallel to the center line of the track. The east line of the right of way is 150 feet east of and parallel with the center line of the track. It is not shown on this plat. The quadrangle, just westerly of the track, with three dimensions marked with broken lines and the southerly line solid, is mentioned in plaintiff's argument as representing a tract leased for lumberyard purposes, but there is no evidence in support thereof. And if it ever was so im-

proved the improvements have disappeared, for said tract has been agricultural land during all times pertinent to matters herein involved.

In 1898 Shay sold to Mrs. Minor Sams an irregular tract, supposed to contain one acre, in the SE¼ of the NW¼ of Section 22. It is described in the county auditor's office as Lot 1 in said 40 acres. The county surveyor surveyed the lot on the ground and made a plat thereof, which is on file in the county recorder's office. The calls of the survey are:

"Commencing at a stone [C on our plat herein] on the east and west center line of said section 22 a distance of 178.20 feet west from the center of the track of the Chicago Great Western Railway, thence west on a variance of nine degrees twenty minutes 49.2 feet to a stone [D on within plat], thence north seventy degrees, twenty four and one-half minutes east 332.64 to a stone [A on within plat], thence east [214 feet 2 inches] on a variance of nine degrees twenty minutes to a stone [B on within plat] in west boundary of right-of-way and thence south thirty two degrees twelve and one-half minutes west along right-of-way 389.4 feet to place of beginning [C]."

On the within plat the survey just noted describes the quadrangle C D E A B F C, or Lot 1, of which the part E F C D was in the highway and not enclosed. The east line of the enclosed portion is the broken line B F.

The plaintiff testified that in 1899—he was then eighteen years old and living in or about Maloy—Sams fenced Lot 1; that is, he built an ornamental metal and iron fence easterly along the north line of the highway, but there is no evidence as to how far east it was built. It is no longer there and the only evidence remaining is part of the west iron post. Sams at that time also built a wire fence on the west line (E A) of Lot 1, and on the north line east from A, but he did not stop at B on the west right-of-way line but continued on easterly a distance of 5 feet 3½ inches beyond B to L, where the northeast corner post of the lot was placed. Plaintiff concedes this. He testified:

"The line from 'A' to 'B' represents the survey of record and the letter 'L' represents the location of the corner post.

I would say that Minor Sams put the corner post at 'L.' Myrtle Sams took title to the property in November 1898.''

There is no definite evidence in the record that the northeast corner post of Lot 1 has ever been at any other place than at L.

With L as the corner post—and the county surveyor probably marked that spot with a stake—there is no evidence just where Sams placed his east line fence. Certainly, with that starting point, if the survey call for the east line was followed the lower terminus could hardly be at F or C.

The land in controversy herein, the possession of which the plaintiff seeks, is the wedge-shaped elongated quadrangle described by the letters B L J F, the west line of which is broken and the east line is unbroken. The north end, B L, is approximately 5 feet 4 inches; the west side, B F, 350 feet; the east side, L J, a little less than 350 feet; and the bottom or south side, F J, is 21 feet 11 inches.

Mr. and Mrs. Sams sold Lot 1 to Mrs. Hannah Lambert in 1913. The lot was improved with the customary buildings: a house, barn, corncrib, granary, chicken house, and other outbuildings. Whether these improvements were made by Sams or Mrs. Lambert does not appear but they were there while she lived there. In 1916 Mrs. Lambert built a garage. Its location is indicated by the oblong rectangle just north of the highway and westerly from J on our plat. A line divides this figure into two parts. The lower part represents the garage built in 1916 and the upper part a coal house built about 1942. The location of neither part has ever been changed.

Roger Warin, a lawyer, now living in Des Moines, was reared in the country near Maloy. After he had completed the country school course, he attended the Maloy High School for the years 1919 to 1923, inclusive. While doing so he lived in the home of his grandmother, Hannah Lambert, on Lot 1. He was very familiar with the buildings and the grounds. It was his job to do the usual chores. He was a witness for defendants. He testified to the location of the garage—a building 10 feet 3 inches wide and 16 feet long—as being, during those and

preceding and succeeding years, at the same place where it is now. The entrance to the garage was at the south end and opened directly onto the highway. At the rear of the garage an ordinary door 3 or 4 feet wide opened from the north end just east of the northwest corner about a foot. During those years the east side of Lot 1 was enclosed by a fence, the north end of which was at the spot marked by L, and extended southerly in a straight line down to and past the east side of the garage and was fastened to a 2x4 nailed to the east side of the garage at about the point J. The northeast corner of the garage was about 2 or 3 feet from the fence. He often raked leaves from the acute angle formed by the fence and the garage, and chased chickens in there and caught them for his grandmother. There were trees, shrubs, and vines north of the garage and along this fence, and also a garden. He testified that this right-of-way fence above described during those years ran approximately where the present fence is. He identified a picture of his two sisters, taken north of the garage in 1922, showing the northeast corner and the trees and bushes growing near. Defendants' counsel says that it shows the fence. The vegetation makes the identification of any fence difficult.

Hannah Lambert died in 1932 and her daughter, Rose Lambert, succeeded to the ownership of the property. There appears to have been no change in the use of the property during her occupancy.

In the fall of 1898 plaintiff's father bought the Shay farm. Plaintiff was born and reared near Maloy. He attended Drake University and the University of Missouri and is a practicing lawyer in St. Louis. He acquired the home place of his father in 1920. It runs along the north side of Maloy, west of the Great Western right of way, and 120 acres is in the town. He has operated the farm directly or by tenants ever since and has been a frequent visitor in the town and vicinity during the years. On May 14, 1940, he leased from the railway company a portion of the right of way west of the tracks north of the highway, including that east of the Rose Lambert property. The lease was for five years with the right of the lessee to continue the leasehold interest thereafter unless terminated as pro-

vided in the lease. He has occupied the leased property since that time. He testified that under the terms of the lease he was required to keep up the railroad right-of-way fence and be responsible for any animal killed by escaping through the fence.

In May 1940 plaintiff replaced the old fence on the east line of the Rose Lambert place so that the livestock he was pasturing along the right of way would not get onto her property. He testified:

"I made the change in that fence by running it from the northeast corner of the Worthington lot [the Rose Lambert lot] to the east side of the garage where I connected it with the fence that went east from the garage at that point."

In other words, he built the new fence along the line L to J on the within plat. The north corner post was placed where Sams had located it in 1899, and the entire fence was where Roger Warin said it was in 1919-1923. He testified:

"That corner post was set there in the same position as the old corner post which it replaced. The line from 'A' to 'B' represents the survey of record and the letter 'L' represents the location of the corner post."

Although he had previously testified he was to keep up the right-of-way fence, concerning this particular fence, he testified:

"The railroad company had promised to furnish all of the materials for the new fence but of the six end posts that the new fence required they furnished only one and that is the iron post on the east side of the garage. * * * The railroad company had to maintain the fence along the east side of this Worthington lot, which was then owned by the Lamberts. When I took over the lease I assumed that obligation. * * * The Court: What fence was it that the railroad company agreed to furnish material for and didn't furnish it? Mr. Hart: The railroad company agreed to furnish the material for the fence along the railroad track. That is a distance of almost fourteen hundred feet * * * So they furnished it from what we call the cattle or underground crossing, up two-thirds of the way through my farm, down to the highway on both sides of the

track, and then when you strike the highway on the west side of the tracks they furnished it from there over to the garage. [This was apparently from the track to J.] The Court understands there is a little portion from the garage going back to the end of the Worthington lot [L] and I didn't regard that as the obligation of the railroad company inasmuch as I was occupying the portion between that lot and the railroad, so that I put that in and furnished the fencing material in its entirety, with the exception of the post on the east side of the garage to which I hitched the fence."

However, the section foreman for the railway company, as a witness for plaintiff, testified:

"Q. Do you know of Mr. Hart constructing that fence about 1940? [The fence along the east side of the Lambert lot.] A. Yes, I hauled the material out there for him. The Court: Did Mr. Hart make this fence after he leased the property or before? A. After. The railroad company furnished the material to put it in and he put it in when he leased it."

This fence which plaintiff built in May 1940 was a substantial one. He had a lease for five and more years. It was a woven-wire fence 52 inches high. Whether there was barbed wire above or below the woven wire does not appear. He testified that he did not build it on the line of the old fence but a little east of it; that the old fence ran from the northeast corner post of the lot—the Sams' corner post—to a little east of the northwest corner of the garage. What reasons did he give for changing the fence eastward to the line L to J? One reason was that he was short of corner posts. Just how he saved a corner post by using the iron post furnished by his lessor at the southeast corner of the garage instead of at its northwest corner is not clear. His other reason was that the Harts and the Lamberts were neighbors in the early 80's in the north part of the county, and "I also had in mind that I was extending a courtesy to Rose Lambert by allowing her the use of the extra few feet between the two lines as indicated. I abandoned the old fence and left the posts there with the wire on them. I put in an entirely new fence with new material consisting

of two 26 inch strips of woven wire, one above the other. In doing so I had not thought of establishing a new line for the railroad right-of-way nor of abandoning any rights that the railroad or I might have in that strip." There is no evidence that he ever said anything to Rose Lambert of the favor he was conferring on her.

On October 5, 1942, Rose Lambert sold Lot 1 to Mary E. Worthington, the wife of the defendant Sam (S. H.) Worthington. When the Worthingtons bought the lot it was completely enclosed with fences from E to A to L to J to E. The fence on the east line was the new fence built by the plaintiff. Mrs. Worthington apparently passed away, although the record does not disclose it. But Sam Worthington has a life estate and the Worthington children, J. H. Worthington and Margaret Bopp, defendants, hold the title subject thereto.

Sam Worthington testified:

"The garage is located on the southeast corner of the lot. It was built along about 1916 and was never moved. It is in the same position in which it was built. In 1942 or 1943 a coal house was built on the north end of it. At that time there was a fence on the east of the garage. It was built under the direction of Mr. Hart. The extension on the garage was built by a carpenter from Blockton. My wife owned the property at that time and she had that done. I can't tell exactly what that extension cost, around $100, the work and everything. We had some of the lumber. We tore it down out of some of the old buildings."

He testified that when the property was purchased it was his understanding and belief that the east side of the property ran to the east side of the garage; and that:

"I claim the land that lays inside of the fence, that railroad fence and the fence on the west. * * * from the corner of the property at the garage to the northeast corner of the lot. * * * Well, I claim the land on the west side of that fence clean through there. * * * I claim the land on the inside of the fences. I bought it with the understanding it was our land. * * * I claim what I bought there inside of those fences, and

building \* \* \* I bought what was inside the fences. All I claim to own is what is inside of the fences that I bought.''

The section foreman, testifying for plaintiff, said that he had been so employed since 1932; that there had been several changes in the right-of-way fence in those fourteen years; that the railway company had maintained a right-of-way fence south to about 100 or 125 feet of the garage; that they always stopped where it cut across the garden which had been maintained until the last three or four years; that he was familiar with the garage and its location; that it was one of his duties as section foreman to maintain and repair the west right-of-way fence north of the highway for the railway company and he did so up until 1940, prior to which time the railroad furnished the materials for repairs to that fence and he and his crew did the work.

A tenant and his son who operated the farm of plaintiff in 1922 and to 1930 and from 1934 to 1938, testified that the railway company maintained the right-of-way fence along the farm, but thought the Lamberts kept up the fence along their property. A number of civil engineers testified for plaintiff but their testimony does not aid much on controlling matters. They found no government stones along the east-west quarter-section line of Section 22, or elsewhere, nor any of the stones noted in the original survey of Lot 1 except at D.

Plaintiff made some measurements, not with a steel tapeline but with a measured stick and square, in the summer of 1945, from which he prepared a plat, introduced as an exhibit. He testified that from A to L was 219.5 feet, and from L to the center of the railroad track at a right angle was 149 feet 9¾ inches.

Plaintiff in his petition alleged what land was covered by his lease and that the defendants as owners of Lot 1 occupied a portion of the leasehold and refused to surrender same on demand of plaintiff, although he was entitled to its possession. He prayed for judgment against defendants and for a writ of possession and for removal of the garage. Defendants by answer admitted their ownership of Lot 1 and denied all other allegations. They alleged open and notorious claim and possession of

the land for over ten years, without claim by the plaintiff or his lessor, and estoppel and acquiescence with respect to the boundary line; the existence of the garage for over twenty years, and the line fence as located for over thirty years. They prayed dismissal of the petition and that title to the premises be quieted in them. For reply plaintiff denied the adverse possession as alleged, denied estoppel upon the part of himself or his lessor, and acquiescence by himself or lessor in the boundary line, and denied other specific allegations.

The cause was tried by the court as a law action upon the issues made by the pleadings and for the relief as prayed. The court reviewed the issues and evidence at length in its opinion and findings and in ruling on the various motions. It found as a matter of fact that the boundary fence between Lot 1 and the land leased by the plaintiff was continuously maintained for more than ten years approximately on the line now occupied by the new fence built by the plaintiff and that the line of such fence was recognized by plaintiff's lessor and the defendants and the prior owners thereof, and was acquiesced in by them and all of them as the true boundary line between said lot and the leased right of way. The court further found that plaintiff had failed to sustain his cause of action. It was the order and judgment of the court that plaintiff's petition and amendment thereto be dismissed; the line of the new fence as built by the plaintiff constitutes and is the true boundary line between the land leased by plaintiff from the railway company and Lot 1; plaintiff is estopped to claim the land which he seeks to recover in this action; and title to said land is hereby confirmed and quieted in the defendants as their interests appear of record.

The court did not find it necessary to pass upon the issue of adverse possession, and based its judgment upon the issues of acquiescence and estoppel.

■ I. It has been the settled law in Iowa for many years that the mutual acquiescence of adjoining landowners in a line marked by a fence, building, or otherwise for ten years as the division or boundary line between their properties makes the line so recognized the true property line. While there is conflict in the evidence, it is our conclusion that there is sub-

stantial evidence to sustain the court's finding and judgment that the fence constructed by plaintiff in 1940 from the northeast corner of said Lot 1 along the east side of defendants' garage and terminating at the southeast corner thereof—that is, from the point L to point J as marked on plaintiff's Exhibit 9 and the plat set out herein—was approximately on the division line of the land of defendants and the right of way of the Chicago Great Western Railway Company as fixed by the acquiescence and recognition of said company and the defendants and their preceding grantors and grantees for more than ten years. The evidence establishes without question that Hannah Lambert built the garage in 1916 and it had stood there for thirty years at the time of the trial. It was on a public highway less than 200 feet from the railroad track. Its location was known to the foreman of that track section since 1932, and it is a fair assumption that others in charge of the company knew of it. There is evidence that the fence between the property occupied and used by defendants and their predecessors for twenty years and more extended from the southeast corner of the garage to the location of the post at the northeast corner of defendants' property set by Sams in 1899. Sams had the county surveyor survey and stake out his lot. The surveyor's recorded plat and field notes state that the northeast corner of the lot was marked by a stone on the west right-of-way line. It is fair to presume that the stone and stake were set on that line if it was marked by a fence or otherwise. If there was a fence there the surveyor would hardly have set the stone or stake east and beyond that line, nor would Sams have crossed the right-of-way fence with his north fence. And if there was a right-of-way fence running east of Mrs. Lambert's buildings south to the highway it is improbable that she would have built her garage east of that fence and separated by it from her other buildings. We agree with the court's findings that the fence was at all times east of the garage approximately on the line of the fence built by plaintiff. The Worthingtons and the preceding owners of that property had improved and used it up to that fence line. The garage had been built and the coal house added in 1942 or 1943. Pear, plum, and other trees and

shrubs had been planted north of the garage and along the fence. A vegetable garden had been maintained along the fence for years, according to the section foreman. He and the crew had maintained the right of way, with materials furnished by the company, which included material for the fence built by the plaintiff, according to the foreman's testimony. The right of way was not cultivated ground but the railway company occupied and used the ground and maintained the fence along it in the manner that railway companies customarily do.

The east boundary line of defendants' property having been settled by the mutual acquiescence of plaintiff's lessor and the owners of said property long prior to May 1940, the plaintiff acquired no right under his lease to the possession of any part of the ground west of said boundary-line fence.

The judgment of the court on the issue of acquiescence in said boundary is sustained by many decisions of this court. We mention a few of them. Bradley v. Burkhart, 139 Iowa 323, 326, 115 N. W. 597, 130 Am. St. Rep. 328; Miller v. Mills County, 111 Iowa 654, 82 N. W. 1038; Johnson v. Trump, 161 Iowa 512, 516–518, 143 N. W. 510; Taylor v. Olmstead, 201 Iowa 760, 764, 765, 206 N. W. 88; Brown v. Bergman, 204 Iowa 1006, 1009–1011, 216 N. W. 731; Kotze v. Sullivan, 210 Iowa 600, 231 N. W. 339; Mullahey v. Serra, 220 Iowa 1177, 1179–1181, 264 N. W. 63; Thompson v. Schappert, 229 Iowa 360, 363, 364, 294 N. W. 580; Sieck v. Anderson, 231 Iowa 490, 496–499, 1 N. W. 2d 647; Minear v. Keith Furnace Co., 213 Iowa 663, 668, 669, 239 N. W. 584; Herrick v. Moore, 185 Iowa 828, 832, 833, 169 N. W. 741; Concannon v. Blackman, 232 Iowa 722, 724, 6 N. W. 2d 116; Patrick v. Cheney, 226 Iowa 853, 856, 285 N. W. 184; Leeka v. Chambers, 232 Iowa 1043, 6 N. W. 2d 837; Vander Zyl v. Muilenberg, 239 Iowa ——, 29 N. W. 2d 412.

II. There is substantial evidence to sustain the trial court's holding that plaintiff was estopped by his conduct to maintain this action against the defendants. Under his lease he claimed the right to possess and use ground west of the fence, which was claimed and occupied by Rose Lambert, for five years and an indefinite period thereafter. But by the con-

struction of the fence he relinquished that right. He did it, as he said, voluntarily and intentionally and under no misconception of his rights. He never informed her of his intentions. He may not have specifically intended thereby to mislead the Worthingtons or any particular persons, but he must be held to have known that in building the fence he might thereby mislead any prospective purchaser as to the ownership of the property within the fence lines. He testified that he had no intention of relinquishing his rights. But his intentions are to be determined not from his secret thoughts but from the reasonable import of his conduct. Actual intention is not necessarily the test of liability. Wallerich v. Smith & Co., 97 Iowa 308, 311, 66 N. W. 184. Worthington testified that he believed he was buying, and thought he had bought, all the ground within the fence lines. Plaintiff's act in building the fence had a reasonable tendency to cause Worthington to believe and act as he did. He will be conclusively presumed to have intended to be understood in accord with the reasonable import of his conduct and he cannot be heard to aver to the contrary as against the defendants. Sessions v. Rice, 70 Iowa 306, 310, 30 N. W. 735; In re Estate of McDonald, 167 Iowa 582, 587, 588, 149 N. W. 897; Criley v. Cassel, 144 Iowa 685, 688, 689, 123 N. W. 348; Hamaker v. Johnson, 199 Iowa 1298, 1300, 202 N. W. 10. In Hainer v. Iowa Legion of Honor, 78 Iowa 245, 251, 252, 43 N. W. 185, 187, the court held: .

"The estoppel is allowed to prevent fraud and injustice, and exists wherever a party cannot, in good conscience, gainsay his own acts or assertions. Again, it is said that where a party, either by his declarations or conduct, has induced a third person to act in a particular manner, he will not afterwards be permitted to deny the truth of the admission, if the consequence would be to work an injury to such third person, or to someone claiming under him. The acts and admissions of a party operate against him in the nature of an estoppel where, in good conscience and honest dealing, he ought not to be permitted to gainsay them. * * * 'A party cannot, either in the course of litigation or in dealings *in pais*, occupy inconsistent positions. * * * A man shall not be allowed to approbate and reprobate.' Bigelow, Estop. 642."

As said in Blackman v. Carey, 192 Iowa 548, 552, 185 N. W. 87, 89:

"Equity will not permit a person to throw another off his guard and through such means obtain an unfair advantage. A person cannot gainsay his own acts and assertions or mislead another to his detriment. If a party to a contract or transaction induces another to act upon the reasonable belief that he will waive certain rights or terms, he will be estopped to insist upon such rights to the injury of him who is misled thereby. * * * Equity requires that a person refrain from enforcing a claim which he has induced another to suppose he would not rely upon."

In Helwig v. Fogelsong, 166 Iowa 715, 723, 148 N. W. 990, 993, the court said:

"Where a party knowingly, though it be done passively by looking on, suffers another to purchase land under an erroneous opinion of title, without making known his own claim, he will not afterwards be permitted to exercise his legal rights against such person. [Citing cases.] A party who has taken one position by which he expects to be benefited is estopped from repudiating that and taking another inconsistent position to the prejudice of another."

See, also, Iowa State Bank v. Rons, 203 Iowa 51, 212 N. W. 362.

It is not necessary that the one sought to be estopped had a fraudulent intent. It is sufficient if a fraudulent result would follow if he be permitted to enforce a claim inconsistent with his previous declarations or conduct. Estoppel may arise from silence when there is a duty to speak. See Helwig v. Fogelsong, supra, 166 Iowa 715, 724, 148 N. W. 990; Hospers v. Watts, 209 Iowa 1193, 1196, 229 N. W. 844; Browning v. Kannow, 202 Iowa 465, 470, 210 N. W. 596; Staples v. Staples, 238 Iowa 229, 237, 26 N. W. 2d 334, 337; Minear v. Keith Furnace Co., supra, 213 Iowa 663, 669, 239 N. W. 584. Such a result would be a constructive fraud upon the injured person. Rice v. Modern Woodmen of America, 197 Iowa 35,

40, 196 N. W. 514; Lemper v. City of Dubuque, 237 Iowa 1109, 24 N. W. 2d 470.

The coal house was built by Mrs. Worthington two years or more after plaintiff leased the right of way. He operated his farm directly and by tenants. He was frequently in Maloy and at his farm. He does not deny knowledge of its erection. He made no protest, and is estopped by his silence.

"The theory of estoppel is that, where one has invaded the right of another, thinking he is within his own right, and that invasion is known to the other, and the other stands by and sees him make valuable improvements upon the invaded territory, under the supposition that it is a part of the possessions of the invader, equity will thereafter deny to the invaded the right to object to the invasion, and will not grant his prayer to have the improvements destroyed or removed, when such act would be greatly to the prejudice of the invader. This estoppel comes pretty near to the rule of adverse possession, though, by its application, one may be estopped though the ten years essential to adverse possession have not expired." Herrick v. Moore, supra, 185 Iowa 828, 832, 833, 169 N. W. 741, 742.

See, also, Minear v. Keith Furnace Co., supra, 213 Iowa 663, 669, 239 N. W. 584.

The principles of the doctrine of equitable estoppel as stated in Haines v. Iowa Legion of Honor, supra, 78 Iowa 245, 251, 43 N. W. 185, have been consistently followed by this court. See Goodwin Tile & Brick Co. v. DeVries, 234 Iowa 566, 13 N. W. 2d 310, 155 A. L. R. 346; Smith v. Coutant, 232 Iowa 887, 6 N. W. 2d 421; Wisdom v. Board of Supervisors, 236 Iowa 669, 19 N. W. 2d 602; Riggs v. Meka, 236 Iowa 118, 17 N. W. 2d 101; Evans v. Davies, 232 Iowa 1207, 1208, 1209, 7 N. W. 2d 780; Seymour v. City of Ames, 218 Iowa 615, 619, 255 N. W. 874.

We have no hesitancy in holding that the findings and judgment of the court that plaintiff had estopped himself are amply sustained under the record.

The Chicago Great Western Railway Company was not a party to this action, and the judgment of the district court is, of course, binding only on the plaintiff.

The judgment is—Affirmed.

OLIVER, C. J., and HALE, GARFIELD, SMITH, MANTZ, MULRONEY, and HAYS, JJ., concur.