L. C. HADSALL, appellee, v. ANNA WEST et al., appellants; HELEN E. SHERRATT, administratrix of estate of Anna West, deceased, also as heir-at-law, and CHARLES F. WEST, heir-at-law, substituted appellants.

No. 48605.

(Reported in 67 N.W.2d 516)

DECEMBER 14, 1954.

REHEARING DENIED FEBRUARY 11, 1955.

Siegers & Bedell, of Newton, and Arnold H. Myhra, of Colfax, for appellants.

Cross & Hamill, of Newton, for appellee.

BLISS, J.—Plaintiff has owned and occupied the Northwest Quarter of Section 11, Township 79, North, Range 21, in Jasper County, Iowa, since 1936. Anna West had an interest in the west half of the Northeast Quarter of said section in 1886 as an heir of her father, Peter Cragen, who bought it in 1872, and by devise and conveyances she became the sole owner in 1936, and so continued until her death during the pendency of this appeal. She died intestate, and her two children, the substituted appellants, inherited said land. The defendants, Clarence and Elma Yoakum, husband and wife, took possession of this land of Anna West, as her tenants, in the spring of 1950, and so occupied it thereafter. Although the record shows them to have no other interest, they have been very aggressive and active participants in the controversy.

The pleadings, in addition to the petition, answer and reply, include cross and counter pleadings and their answers, necessarily quite repetitious, cover thirty-one pages of a 225-page printed record, and it is difficult to make a concise statement of them. Able opposing counsel disagree somewhat on the nature of the issues.

The farms of the parties are about a mile west of the city of Colfax, and abut paved Highway No. 6 on its south side. Plaintiff was a tenant on his present farm during the year 1930. It was then owned by the children of Joanna and George Evans. The parents had acquired the farm April 12, 1892, by deed from James Callanan. Joanna Evans, by decree of divorce and quitclaim deed, became the sole owner of the farm in 1902 and lived on it until her death in January 1921. Her children then inherited this quarter section and another quarter section just west of it. Later, in a partition suit, the said Northwest Quarter of Section 11 was sold to plaintiff, and he received a referee's

deed to it dated November 7, 1936. During 1937 he operated the farm by hired help, and in October of that year he and his family took actual possession of the farm and have operated it since.

The farm buildings on the place were in the north part on what was known as Indian Hill, because of arrowheads and Indian relics found there. In the south or back end of the farm there was a house whose occupants were not engaged in farming, but were otherwise employed. The main farm buildings were in the same location at the time of the trial as they had always been, except that in 1945 or 1946 a new residence was built about five rods north of where the house had formerly been. There was at all times a driveway leading directly north from the farm buildings to the public road, now designated as Highway No. 6. This driveway is about 600 feet west of the north end of the boundary line involved in this suit.

The buildings on the eighty acres of Anna West, and those claiming under her, have been and are about eighty rods south of the northwest corner of the tract and quite close to the west line. This west line, as surveyed by the Government, coincides, of course, with the east boundary line of plaintiff's land, and is the line about which this litigation centers.

When plaintiff bought his farm the inside fences, and particularly the division fence between his land and that of Mrs. West, were bad, and in 1938 he asked her to join him in having a survey made. She refused. Plaintiff then employed B. H. Shivers, sixty-nine years old, of Des Moines, a licensed civil engineer of thirty-five years experience, to locate on the ground, the Government survey line between the two properties. This he did in October of that year. He found all of the Government survey corners of the section. Both sides agree that there is no question as to the correct location of these corners. Mr. Shivers found the north quarter corner of the section marked by a lead plug in the center of the highway on the north side of the section. By the north quarter corner is meant the point at the center of the north line of the section east and west. That would be the northwest corner of Mrs. West's land and the northeast corner of plaintiff's land. Mr. Shivers found the cen-

ter of the section and marked it with a flat metal bar, the dimensions of which were 7¼″ x ⅜″ x 4′. He sank this in the ground at the center point of the section with the top somewhat below the surface of the ground. A line drawn between the north quarter corner directly south to the center point of the section is the true Government survey line making the boundary line between the land of the parties.

Mr. Shivers as a witness for plaintiff testified: "I made observations or notations in regard to the location of the north and south division fence between the two farms. The corner post at the south end was two feet west of the center of the section, and the forty going north would be eighty rods north, about seven or eight feet west. That was the way the fence was located in 1938."

Plaintiff testified: "When I had Mr. Shivers make a survey in 1938 I asked Mrs. West to go with me and make it and she refused. After I had made that survey I asked Mrs. West a time or two for us to try and get those fences straightened up, that I didn't think I should be furnishing the land there for that road, although I was using it too, somewhat, as I continued to use it to go to my field when I needed to. If I wanted to move down the pavement, I went down that road and came in there and went up in the back field. I got through that fence at the gate at about the forty-rod line."

As noted herein, counsel viewed the issues in differing lights. Counsel for appellee thus expressed it in their Brief and Argument on page 3 thereof:

"The Nature of the Action: Though Appellants' Statement of the Nature of the Action is literally correct, it is so composed as to give an inaccurate perspective of the case. It depicts the controversy as principally a line fence dispute governed by the judicial rules of acquiescence and adverse possession, whereas the original and principal issue between the parties was the question of the right of appellants to an easement for a private roadway over Appellee's land, governed by the legislative requirements of Section 564.1 of the Iowa Code."

Appellants in their Reply Brief and Argument challenge this contention of appellee, and close with this sentence: "Appel-

lants believe that an examination of the pleadings as they appear in the record will disclose that the nature of this action and the issues raised by the pleadings are as stated in their Brief and Argument."

We agree with appellants' position, although there is potential, or rather, apparent, basis for appellee's view. It is true that appellants claim the roadway, but they do not contend they have an easement for a roadway. An easement in land, as this court has held in many decisions, "is a liberty, privilege or advantage in land without profit, *existing distinct from the ownership of the soil * * *."* See Cook v. The C., B. & Q. R. Co., 40 Iowa 451, 456, and cases cited in Webb v. Arterburn, 246 Iowa 363, 378, 67 N.W.2d 504, 513. (Italics ours.)

It is true appellants are claiming the roadway, which, for approximately 850 feet, is on appellee's land, according to the Government survey, but they claim its *ownership* and *absolute title* by acquiescence and adverse possession, and not an *easement* in it. The word "easement" is not to be found in their pleadings nor their Brief and Argument.

We will now discuss this roadway or lane or "trail", as some witnesses speak of it. The record clearly establishes that for many years, both before and since plaintiff became the owner of the NW¼ of Section 11, there had been a lane along the east line of this quarter section extending from the highway on the north to the south or back area of this quarter. It is established without serious question that this lane has been fenced on both sides. William J. O'Neill was a witness for plaintiff. He testified: "If I live I will be 96 years old March 24th." (The trial was from the second to and including the fourth day of November 1953.) He said that he came to the Colfax vicinity on December 21, 1881, and was there until 1905, and was then away for about thirty years, and came back in 1928 for a few days visit, and then came back to Colfax and Des Moines in 1932. For some years before the trial he had lived in Colfax. Before 1905 he had farmed for seventeen years a mile south from the Hadsall (plaintiff) place. He remembered when Callanan lived on the place and had the buildings on the hillside. He testified: "There was a trail went up from the highway on the west side of the fence

to the south end of this Hadsall place. Then it turned west to the buildings. The fence I speak of was a fence between what is now the Hadsall place and the farm east of it [the Anna West farm]. *That trail was fenced in.* You had to open a wire gate to get out." The clear import of this testimony is that the fence on the east side of the "trail" was the line or division fence between the Hadsall farm and the West farm, and the west fence of the lane was on the Hadsall land. He was asked if the Callanan people traveled on the west side of the fence in going back to the buildings. His answer was "That was just a private drive from the road, from the highway, up to where the buildings were. * * * The owners on both sides farmed right up to the road. Left the trail. [That is, they did not cultivate it.] The trail went within a couple of rods of the south end of the division fence and made a turn west down to the buildings. [The buildings are those hereinbefore referred to occupied by others than the owner's family who lived at the main farm buildings.] Mr. Cragen or his tenants farmed up to the road on the east side of the fence. They pastured right up to that fence. That fence was in the same location all the time I knew it. Q. And that roadway leading from the highway up to Mrs. West's house also appeared to be in the same place? A. *No. No, it is on the west side of the fence.*" (Italics ours.)

Mrs. Ida Stamper, 83, testified for plaintiff. She was a daughter of Joanna Evans, and in the division of the Evans real estate her interest was in the farm purchased by plaintiff, on which was the Evans family home. They lived on it from 1891 to 1906, and she visited her mother who remained on it till her death in 1921. She was asked: "Was there a kind of trail or road on the west side of that fence? A. Well, I don't know. I couldn't say, but I think there was. There must have been for that gate. Q. There was a gate there anyway? A. Yes, when the farm was bought there was a gate there. Yes."

John Warrick, of Monroe, lived near Colfax all of his life until 1934. As a witness for plaintiff he testified: "I am acquainted with the land now owned by Lewis C. Hadsall which used to be known as the Evans place west of Colfax. I was a tenant on that land in 1922 and 1923. When I lived there, there was a sort

of a road or lane running back from No. 6 along the division line between me and the farm east of it. There was a fence on each side of it. There was a gate in each fence on each side of the lane." When a wind blew a tree across the lane fence, he repaired it. He said, "the fence I am referring to is the fence that was on the west side of this road leading to Anna West's buildings." He testified that the occupants of the land on each side of the lane used it indiscriminately, without either objecting to the other or claiming the exclusive right to use the lane.

Plaintiff testified that he was well acquainted with the farms for years before he bought his. The fenced lane was there when he operated his farm as a tenant in 1930. As a tenant, and later as an owner from 1937 on down, he used the lane in going back to do farm work in the south part of the farm and in going to and from the other buildings back there. The tenants of those buildings used the lane in going back and forth. Mrs. West testified in cross-examination: "I spoke about [in direct examination] the people who occupied the house using the lane to get back there. The man and his wife both worked for my father and they had that means of getting down to our place." Some years back these buildings were torn down, but the lane was still kept open and in use in farming the south eighty acres. Plaintiff testified that the various tenants on the West land used the lane at all times in doing their farm work and in passing to and from Highway No. 6, and in driving cattle across the road to land owned by Mrs. West to the north. Each used the lane for years with friendly relations until the Yoakums became tenants of Mrs. West in 1950. Other witnesses for plaintiff and for defendants testified that the lane was fenced on both sides.

Mrs. West never disputed the existence of the lane nor that it was fenced on both sides. She testified: "There was a fence for that purpose [to restrain livestock] along the east side of that lane. It was fenced on both sides, woven-wire fence. That was always the case as long as we lived there and for years afterwards. It has always been the case as I remember now."

To show the location of the lane with respect to the north

quarter corner of Section 11, we insert in the opinion a tracing from defendants' Exhibit 1 which is a blueprint showing part of a survey made by the Iowa Highway Commission in March 1948 in laying out and constructing Highway No. 6, abutting Section 11 on the north. The lane is designated by the figure 2 in its center. The figure 4 indicates the right angle formed by the fence lines at that time in the northeast corner of plaintiff's, Hadsall's, land; figure 5 indicates the northwest fence line corner of the West land; figure 3 indicates the crossing of the roadway from the lane to the paved surface of the highway, which is marked by the two broken horizontal parallel lines running east and west; the small circle, with the figure 1 just above it, between these parallel lines in the center of the paved slab marks the north quarter corner of Section 11, as found by the surveyors of the Iowa Highway Commission in 1948. As we have already stated, the north quarter corner of a section is the starting point at the north end of the north-south center line of any section. Such line, as the drawing shows, would coincide with the east fence of the lane, or the west line of the West land, and would place all of the lane on plaintiff's land.

Defendants alleged in both their answers and cross-petition, and so contended in the district court, and, as they argue in this court, that regardless of the location of the north-south center line of Section 11 by Government survey, the boundary line, in fact, between the two properties, for the north sixty rods thereof, as established by acquiescence and adverse possession, is the west fence line of the lane.

It was the contention of plaintiff in the trial court, and is in this court, that neither he nor any of his predecessors in title ever considered the west fence line as a boundary line of their lands, but always regarded it, and used it, only as a barrier to protect their crops from livestock and traffic, and that defendants never considered or treated it otherwise until shortly before this litigation. The position of plaintiff has substantial support in the record. The west fence line of the lane was never a substantial fence. It was always a makeshift fence patched and repaired only enough to meet its purpose as a barrier. This was true while it was owned by Mrs. Evans and her family. Mrs. Stamper, her daughter, testified that her mother was "always patching it up", and said that was the only way to do. Plaintiff testified that he maintained it in the same manner. During the years of his ownership the fence was moved several times as a matter of convenience. In 1946 or 1947 when they were baling hay in the south part of the farm and part of the hay was being hauled to Des Moines in large trucks, thirty rods or more of the west fence were moved two or three feet west to give sufficient width of travel to the haying equipment. Later the remainder of the fence was moved west the same distance to give more room for handling farm machinery. In 1950 it was all moved back east to the place from which it had been taken. Plaintiff described the lane fences as "just old fences with a few stakes in them. You could hardly call them fences." Ed Schlosser, a witness for defendants, said of the fence on the west side of the lane: "Well, there is something there, imitation of a fence, but it wasn't a fence, but there was a makeshift of a fence. * * * The fence that I noticed on the west side there during all of the time I

knew the place wasn't a good fence at no time. It didn't have the appearance of being a substantially built permanent fence. The appearance of it is just a garbled up affair. You couldn't help but notice it."

Defendants made no claim and offered no evidence that there ever was any agreement with plaintiff that the west lane fence was the boundary line between their properties. Neither is there any competent evidence of any substance of the establishment of such boundary by acquiescence or adverse possession. But there is competent evidence to the contrary. We have already set out evidence that after the Shivers survey in 1938 plaintiff went to Mrs. West and asked her to join with him in straightening and correcting the fences, and that one or more times later he made the same request. Mrs. West did not deny the 1938 request, but said she did not remember it. She admitted that he made such requests later, for she testified: "The first time Mr. Hadsall said anything to me about the division fence not being where he thought it should be was during the time I rented the farm to Mr. Hadsall and his son, I think 1947, 1948 and 1949, for three years. During that time he suggested that he would help to build a new road for me and move the fence over where he thought it should be."

In 1950 Mrs. West had her tenant, Yoakum, build a new fence on the south eighty rods of the division fence, which was her half to maintain. At the north end, Yoakum plowed a furrow of dirt in the lane against the west fence and blocked the lane so plaintiff could not get through with the combine and wagons while threshing. He and a helper were shoveling out the obstruction and Clarence Yoakum came along and cursed them, and said "they had no business there." Plaintiff then went to Mrs. West and told her he would not submit to such abuse, and that he was going to put the fence in its proper place on the original line and close the lane. She then protested that she would have no road and plaintiff told her he would take his machinery and help her build a road on her own land. Mrs. West then offered to buy the lane from plaintiff and he refused and told her the cost of the abstract of title would be more than the strip of land was worth. Mrs. West

did not deny this, but testified she told him if he thought he owned the strip she would buy it from him. In the fall of 1950 plaintiff moved the old and temporary fence along the west side of the lane back to where it was when he moved it to widen the lane. The Yoakums continued to show resentment.

In March 1953 plaintiff, with a helper and his boys, began the construction of a new fence along the north sixty rods of the Government division line as marked by Mr. Shivers in 1938. While they were building the fence the Yoakums came down and cursed them and demanded to know what right they had to build the fence. Nevertheless the sixty rods of fence from the north end was completed. It was a substantial woven-wire fence with three strands of barbed wire above it.

One night about the first of April, 1953, after plaintiff and his wife had retired, their dog began barking violently, and they could see lights off east toward the West property. In the morning they went to the fence and found the Yoakum tractor standing next to the corner post at the south end. It had successfully resisted efforts to uproot it, but all the other posts and wire for thirty rods had been torn up and scattered back for many rods in plaintiff's clover field. One of the steel posts which plaintiff failed to find broke the sickle in his mower later.

As witnesses in the trial, Yoakum admitted that Mrs. Yoakum late in the afternoon preceding the destruction of the fence had pulled all the staples from the posts, and that night they completed the destruction.

Plaintiff made no complaints to anyone, but later he and his son were plowing just west of the destroyed fence, and Mr. and Mrs. Yoakum came down and asked plaintiff what he was going to do and he told them that he was going to finish the plowing. Plaintiff testified to what took place as follows: "He [Yoakum] said, 'By God, I will go to the house and get my gun if you plow that up. There will be somebody lying dead in that road.' My boy, Joe, spoke up and said, 'We have a gun, too'. I said, 'No, Joe, we won't use no gun. We will let the law take its course.'" The record supports this version of what took place.

Sometime later on, in the first part of May, 1953, the Yoakums, with some male relatives of Mrs. Yoakum, began tearing out the remaining portion of the fence, about the north half of the sixty rods. Plaintiff and his wife went down and tried to induce them to desist. A young man helping Yoakum, said to plaintiff, " 'You come over here any nearer and I will hit you on the head with a hammer.' " Defendant Clarence Yoakum spoke up and said, " 'He will do it, too.' "

The final result was that the entire fence built there in March 1953 was torn down except one corner post. Plaintiff estimated the reasonable cost of building a rod of fence, including labor and material, was $3, or $180 for the sixty rods, and that the loss of the pasture because of the destruction of the fence was reasonably worth $150.

On September 18, 1953, Mr. Shivers, at the request of plaintiff, again made a survey of the north-south center line of Section 11, from the north quarter corner to the center of the section, according to the Government survey, and made a blueprint of his survey, designated as Exhibit A. On this blueprint he showed the lane, which we have discussed, and both of its fences, from its starting point on the north line of the section to its termination in front of the West buildings. The blueprint shows that approximately the north forty rods of the lane is entirely on plaintiff's land and it then continues partly on the lands of both for twenty rods, at which point it is wholly on the West land.

On August 19, 1953, plaintiff filed his petition alleging his construction in March 1, 1953, of a fence on the north sixty rods of the division line between his land and the land of the defendants, as located by the Government survey, and of its entire destruction by the defendants, and of their threats to again destroy it if replaced. He prayed for damages in the sum of $1000 and for an injunction restraining defendants from trespassing on his land and from interfering with his fence. Defendants filed answer, which was mostly a general denial, and also filed a cross-petition, describing the boundary line for the entire 160 rods between the properties as established by

adverse possession and acquiescence, and praying for decree quieting title to the land so claimed by them, and for an injunction restraining plaintiff from trespassing on said land or interfering with the fences constructed thereon. Plaintiffs then filed a counterclaim alleging that the location of the south half of the division fence had not been put in issue by plaintiff's petition, but since defendants had put that matter in issue by their cross-petition, plaintiff prayed for mandatory injunction directing defendants to remove the fence so placed by them on the south eighty rods of the division, and to construct in place thereof a new fence on the line of the Government survey.

The trial ended on the fourth day of November, 1953, and on November 6, 1953, the court filed its findings of fact and conclusions of law, and on November 13, 1953, its decree. In its sixteen findings of fact the court reviewed the pertinent facts, and then stated its conclusions of law therefrom, and rendered decree accordingly. We fully agree with the findings, conclusions and decree. It is our firm conclusion that the record sustains the action of the able and experienced trial court in every respect.

Some criticism is expressed in appellants' Brief and Argument because of the promptness with which the court decided the case, and intimating that therefore ample consideration was not given to it. We commend the court for its prompt decision. It would be well if it were done more often. The controlling matters for determination were factual. The testimony was conflicting. The court acted while the testimony was fresh in mind. The principles of law involved in the case have long been recognized and were well known to the trial court.

With respect to the south half of the division fence, which defendant Anna West was required to maintain, and who had there constructed a fence in 1950 which encroached on plaintiff's land throughout its length, the court ordered defendants to remove the fence, and to reconstruct and rebuild it on the true boundary line between the two farms as established by the Government survey and as shown on the plat as Exhibit A, made by B. A. Shivers in connection with his survey of September 18, 1953.

The court further ordered that after the reconstruction of said fence by defendants, they and their servants, employees and all persons through or under them, were permanently enjoined from trespassing or using any part of the S½ of the NW¼ of said Section 11.

As to the north half of the division line between the two farms, and the fence thereon for the maintenance of which plaintiff is responsible, the court authorized him to construct a division fence upon the true boundary line established by the Government survey as shown in the aforesaid Exhibit A.

The court also ordered that defendants, their servants and employees, and all persons claiming by, through or under them were permanently enjoined from in any manner interfering with the fence last-mentioned, or its construction and maintenance; and after the construction of said fence where it crosses the private road in controversy, the aforesaid parties are also permanently restrained and enjoined from trespassing upon or using any part of the N½ of the NW¼ of said Section 11, lying west of the true boundary line hereinbefore referred to between the two farms involved in this case.

Judgment was also rendered and entered against the defendants for damages in favor of plaintiff in the sum of $180, and for the costs taxed at $162.16.

Defendants have ably argued in this court their propositions relied upon for reversal and have cited and discussed many cases in support thereof, among them being Miller v. Mills County, 111 Iowa 654, 82 N.W. 1038; Vander Zyl v. Muilenberg, 239 Iowa 73, 29 N.W.2d 412; Eggers v. Mitchem, 239 Iowa 1211, 34 N.W.2d 603; Sieck v. Anderson, 231 Iowa 490, 1 N.W.2d 647; Leeka v. Chambers, 232 Iowa 1043, 6 N.W.2d 837; Lannigan v. Andre, 241 Iowa 1027, 44 N.W.2d 354; Atkins v. Reagan, 244 Iowa 1387, 60 N.W.2d 790; Bagley v. Petermeier, 233 Iowa 505, 10 N.W.2d 1; Hart v. Worthington, 238 Iowa 1205, 30 N.W.2d 306; Roberts v. Walker, 238 Iowa 1330, 30 N.W.2d 314; Brewer v. Claypool, 223 Iowa 1235, 275 N.W. 34; Gerdts v. Mulford, 230 Iowa 647, 298 N.W. 873; Clear Lake Amusement Corp. v. Lewis, 236 Iowa 132, 18 N.W.2d 192; Concannon v. Blackman, 232 Iowa 722, 6 N.W.2d 116; Thomp-

son v. Schappert, 229 Iowa 360, 294 N.W. 580, and others.

The parties are in no serious dispute respecting the applicable law, and nothing would be gained by discussing the cited cases.

While an appeal in an equitable action is a review anew in this court upon the law and the facts, the findings of fact and conclusions of law of the trial court should receive serious consideration. This is especially true with respect to the probative value of the testimony. The trial court sees and hears the witnesses and is in an advantageous position to judge their interest or lack of interest, and to appraise the worth of their testimony. Defendants claim the west fence of the lane as the boundary line between their land and that of plaintiff, for approximately the north sixty rods. The south twenty rods of this lane or "trail", or down to about the eighty-rod line, were east of the Government division line, according to the survey of Mr. Shivers as shown on his blueprint, Exhibit A. There was no lane or "trail" along the south eighty rods of the division line. The line, to which defendants claim, is thus described by them: "Beginning at a point 21.2 feet west of the quarter section corner on the north line of Section 11 run thence southward 80 rods to a point which is 12 feet west of the north and south center line of said section as shown on Exhibit A, and run thence south to the south line of the north half of said section at a point one foot west of the north and south center line and marked as Station 26 + 42.5 on Exhibit A." Since surveyors' stations on a long straight line are usually 100 feet apart, Station 26 + 42.5, or the center of the section, was 2642.5 feet south of Station 0 (zero) at the north quarter corner of the section.

Exhibit A is Mr. Shivers' blueprint made after his resurvey on September 18, 1953. On this exhibit he marked the line of the fence built by defendant Clarence Yoakum in 1950. This fence at the south end (Station 26 + 42.5) is one foot west of the center of the section. Farther north at Station 17 + 62.5 the fence is 4½ feet west of the center line. At Station 13 + 22.5, which is approximately the eighty-rod line, it is twelve feet

west of the north-south line. Station 13 + 22.5 is about at the opening of a natural gully, through which the Government north-south center line runs. In 1930, when plaintiff was a tenant on his land, the north-south fence on the true line ran through this gully, the sides of which were overgrown with brush and scrub trees, and were gradually eroding away, and it was impossible to maintain a stockproof fence there. Plaintiff's calves were continually getting out, so he built a temporary fence up on the bank out of the thicket, on the west side of the gully. Photographs show a post of this fence remaining. When Yoakum built the fence in 1950 he followed the line of plaintiff's old temporary fence, by angling the fence northwest to a point twenty-four feet west of the north-south center line, and then angled the fence northeast until it reached the true north-south line at Station 10 + 48 on Exhibit A. So the fence that Yoakum built for Mrs. West in 1950 was on plaintiff's land for its entire length. Nevertheless, when plaintiff filed his petition in this suit he sought relief only with respect to the sixty rods of fence south of the north quarter corner, which the Yoakums had destroyed. The defendants made the south eighty rods of the division line of the two farms an issue in this suit by their cross-petition.

We are abidingly convinced that plaintiff has fully sustained the allegations of his pleadings, and that defendants failed to establish the boundary line claimed by them, either by mutual acquiescence therein by the parties, or by the adverse possession of the defendants or any of them.

Therefore it is the conclusion of this court that the judgment and decree appealed from should be, and it is—Affirmed.

GARFIELD, C. J., and OLIVER, WENNERSTRUM, HAYS, MULRONEY, THOMPSON, and LARSON, JJ., concur.